(No. 72959.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. BERNON HOWERY, Appellant.

*Opinion filed September 18, 1997.—Rehearing denied December 1, 1997.*

2

4

6

Charles M. Schiedel, Deputy Defender, and Kim Robert Fawcett, Assistant Appellate Defender, of the Office of the State Appellate Defender, of Chicago, for appellant.

James E. Ryan, Attorney General, of Springfield, and William E. Herzog, State's Attorney, of Kankakee (Barbara A. Preiner, Solicitor General, and Arleen C. Anderson and Michael A. Hurst, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE McMORROW delivered the opinion of the court:

The defendant, Bernon Howery, was charged by indictment with four counts of first-degree murder (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(a)(2)), four counts of felony murder (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(a)(3)) and one count of aggravated arson (Ill. Rev. Stat. 1989, ch. 38, par. 20—1.1). Following a bench trial, the circuit court of Kankakee County found the defendant guilty of all charges. The defendant waived his right to a jury for the sentencing phase of the proceedings, and the circuit court found him eligible for the death penalty based on four aggravating factors (720 ILCS 5/9—1(b)(3), (b)(6), (b)(7), (b)(11) (West 1992)). The court then determined that there were no factors presented in mitigation which would preclude the imposition of the death penalty, and sentenced the defendant to death. The sentence has been stayed pending direct appeal to this court. Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d R. 603. We now affirm the defendant's convictions, but reverse and remand for a new sentencing hearing.

## BACKGROUND

During the early morning hours of December 9, 1989, a fire occurred at the home of Linda Walls at 656 South Wildwood in Kankakee, Illinois. Linda's four children, LaDonja Walls, age 11, Prima Walls-Howery, age 10, Joel Howery, age 9, and Justina Howery, age 5, all died from carbon monoxide poisoning as a result of the fire. The fire originated in a storage closet underneath the only set of stairs which led to the second-floor

bedrooms where the children slept. The defendant was the father of the three youngest children who died in the fire.

In the days following the deaths of the children, the defendant made a series of statements regarding his knowledge of the fire and his whereabouts on the night of December 8 and the early morning hours of December 9. On January 3, 1990, the defendant was indicted in connection with the deaths of all four children on four counts of first degree murder under section 9—1(a)(2) of the Criminal Code of 1961 (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(a)(2)), four counts of felony murder under section 9—1(a)(3) (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(a)(3)) and one count of aggravated arson (Ill. Rev. Stat. 1989, ch. 38, par. 20.1—1). The defendant subsequently entered a plea of not guilty to each of the crimes charged.

In December 1990, the defendant's attorney filed motions to suppress his statements and evidence which was seized after the fire. Both motions were denied. The defendant waived his right to a jury trial.

## Trial Evidence

Linda Walls testified that the defendant was the father of her three youngest children, Prima, Joel and Justina. Linda characterized the defendant as a very loving and interested father, who assisted in raising the children. She stated that the defendant treated her oldest child, LaDonja Walls, as if she were his own.

Linda testified that despite the defendant's loving relationship with the children, her own relationship with him was turbulent, punctuated by periods of fighting. Linda testified that she had been involved with the defendant for 12 years. In the fall of 1989, their relationship was coming to an end.

Linda described an October 1989 incident in which the defendant burned her with his cigarette by flipping

it at her during the course of an argument. Linda explained that the defendant had been drinking excessively for several months, and that they often argued when he was drinking. She also stated that the defendant had been living with her on Wildwood, but that she was the sole owner of the home. After the cigarette incident, Linda asked the defendant to move out and he complied.

Linda also testified regarding an incident in November of 1989, in which the defendant arrived at her home unannounced and uninvited. The defendant wanted to spend the night at the house, and Linda permitted him to sleep on her sofa. At some point during the evening, the defendant entered Linda's bedroom and indicated that he wanted to have sexual intercourse with her. Linda testified that when she resisted the defendant's advances he struck her three times in the head and then began to wrestle with her. At that time, Linda's brother, Johnny Walls, entered the room and the defendant punched him in the mouth. Johnny lived in the basement of Linda's home.

Linda then testified to an encounter with the defendant on December 6, 1989. She stated that when she arrived home from work that day, she found the defendant sitting on her front porch. The defendant stated that he wanted to rekindle their relationship. He also threatened to kill anyone that she dated. Linda further testified that the defendant told her that he did not want anyone else in her life but him, and that no one else could be in the children's lives.

Approximately two weeks prior to the December 6 conversation with the defendant, Linda had begun dating Keith Ward. On the night of Wednesday, December 6, 1989, Ward spent the night at Linda's house.

Linda testified that at 5:30 a.m. on Thursday, December 7, while she was dressing for work, the defen-

dant arrived at her front door and asked to come into the house. Linda stated that she denied the defendant permission to enter and told him that he could stay in his car in the garage if he wished.

Linda testified that at 10 a.m. that same day, she received an hysterical phone call from the defendant while she was at work. The defendant was crying and stated that he was hurt because he saw Keith Ward leave her house that morning. The defendant told Linda that he had been in the garage pointing a gun toward Ward's head. The defendant also told her that he could have shot Ward, but refrained because he did not want to hurt her. Linda testified that the defendant stated that he wanted her back in his life. Linda also stated that after she received several calls from the defendant throughout the day, he eventually told her that he would write her a letter.

Linda testified that on Friday, December 8, she did not go to work. That day, the defendant came to her home unannounced at approximately 11:45 a.m. in order to deliver the promised letter. The defendant then asked Linda to drive him to the courthouse, and she agreed. While in the car, the defendant asked Linda to marry him. Linda testified that she told the defendant that she could not give him an answer because of the "animosity" that had built up between them and because of his abusive behavior. The defendant responded by arguing that he had changed. Linda then told the defendant that Keith Ward was going to drive her and the children to Chicago for a Christmas party on Saturday, December 9. The defendant responded by stating that it hurt him to see someone else with his children. Linda then reassured him that he would always be the children's father, and the defendant stated that he could accept her wishes and understood the situation. Linda dropped the defendant off at the courthouse at approximately 1 p.m.

Linda testified that on the afternoon of Friday, December 8, 1989, she, Keith Ward and the children went out together. That evening they all returned to Linda's home. Linda and Keith had plans to go out that night. Linda stated that while she was preparing for the date, Keith and Johnny Walls went out together. While they were gone, sometime after 10:30 p.m., the defendant arrived at Linda's house unexpectedly. The defendant stated that he bought some beer for Johnny. Linda then asked the defendant to leave peacefully because she was expecting Keith and Johnny to return any minute. At that moment, Keith and Johnny pulled up in the car and the defendant walked away.

Linda testified that she and Keith left for their date at approximately 11:30 p.m. or 12 a.m., but she was not certain of the precise time. She stated that prior to leaving she did not detect any smoke in the house. Linda testified that when she returned home sometime after 1 a.m. the house was in flames and the fire department was fighting the fire.

Linda explained that following the fire, she recovered the defendant's unopened letter from the house. In the letter, the defendant describes his emotional turmoil over their relationship.

On cross-examination, Linda testified that she did not use the storage area underneath the stairs to store clothing. She further stated that on the day before the fire, she had taken the dirty clothes in the house to the basement to wash them.

Keith Ward also testified on behalf of the State. He corroborated much of Linda's testimony. He further testified that on the night of December 8, when he returned to Linda's home with Johnny Walls, he encountered the defendant leaving the house. Ward testified that the defendant did not acknowledge his presence. Instead, the defendant announced that he had

hoped to drink a beer with Johnny, but did not want to stay because he did not like the company. Ward stated that he and Linda left for their date around 11:30 p.m. or 12 a.m., but he was not sure of the precise time. On cross-examination he testified that he and Johnny returned from the liquor store around 11:45 p.m.

Johnny Walls also testified. His testimony corroborated Linda's account of the defendant's behavior in November of 1989, when the defendant punched Johnny in the mouth.

Johnny testified that before the fire, he had been living in Linda's basement. Johnny stated that on December 8, Linda came home with Keith and the children around 10 p.m. He said that he and Keith went out together and then returned to Linda's house where they saw the defendant leaving. Johnny's testimony regarding the encounter with the defendant substantially corroborates Ward's account.

Johnny further testified that shortly after Linda and Keith left on their date, the defendant returned to the house with a bag under his arm. Johnny stated that he assumed that the bag contained a six-pack of beer, but he never actually saw the beer. Johnny testified that the defendant left the house again in order to purchase cigarettes, and then returned.

Johnny further testified that while he and the defendant were sitting in the living room drinking beer and smoking, Billie Jones arrived at the door. Jones asked Johnny if he was ready to go. He also offered to give the defendant a ride. The defendant indicated that he was going to finish his beer. Jones then drank a beer with Johnny and the defendant, as they sat in the living room talking and smoking cigarettes. Johnny testified that as he and Jones were about to leave, the defendant asked Johnny for his lighter and Johnny gave it to him.

Johnny explained that while he and the others were

sitting in the living room, Prima, Joel and Justina were watching TV on the first floor of the house in Linda's bedroom. Johnny stated that he sent the children to bed around 11:30 p.m. just before leaving the house with Billie Jones. On cross-examination Johnny stated that he sent the children to bed closer to 12 a.m.

Johnny testified that before leaving with Jones, he told the defendant that he would return in "about 15 minutes, before [the defendant] finished his beer." Johnny said that he and Jones drove around, and then went to Nightingale where they stayed for about 15 to 20 minutes and drank a beer. Johnny testified that while they were at Nightingale, they met Oscar Stancil and decided to go to his house. Johnny explained that while they were on their way to Oscar's house, they noticed the fire at Linda's house. Johnny stated that he attempted to enter the house, but was removed and placed in a squad car.

Billie Jones also testified. He stated that he is married to Linda Walls' sister. He testified that on the night of December 8, Johnny Walls and Keith Ward stopped at his home "a little after 11:00." He testified that after taking a shower, he went to Linda's house to meet Johnny. Jones stated that when he arrived, Johnny and the defendant were in the living room.

Jones further testified that he remained at the house for about 15 or 20 minutes and drank beer. He explained that he and Johnny left almost immediately after Johnny sent the children to bed. Jones testified that before leaving, the defendant asked for a ride to the Model Motel, and Jones agreed. However, when it actually came time to leave, the defendant stated that he was going to stay and finish his drink. Jones further corroborated Johnny's testimony that the defendant asked to have Johnny's lighter, and Johnny complied.

Jones stated that he and Johnny went to Paradise

Lounge, but did not have a drink. He stated that they then went to Nightingale, where they stayed for 15 to 20 minutes and drank a beer. On cross-examination, Jones testified that he met Johnny at Linda's house around 12:45 a.m. and stayed for 10 or 15 minutes.

The State then presented the testimony of several witnesses who discovered the fire at approximately 1 a.m. on December 9, 1989.

Three civilians who were driving in the neighborhood stopped at the scene. These witnesses testified that they saw smoke coming from the house, but initially did not see flames. The civilians attempted to enter through the front and back doors and the second-floor window, but were unsuccessful because the smoke was intolerable. The witnesses stated that they could see a red or orange glow on the first floor and in the basement. The witnesses further testified that the fire department arrived approximately 5 or 10 minutes after they did, around 1:10 a.m. One witness testified that by that time, flames had broken through the roof of the house.

Additionally, Thomas Champion, an Indiana firefighter who lived on Linda Walls' block, testified that he was awakened at 12:55 a.m. by the sound of a dog barking. Champion stated that he could smell a strong odor of wood burning. He told his wife to call the fire department and left to seek out the fire.

Champion stated that he traced the smoke to Linda Walls' house. When he approached Walls' house, it was in the process of "breathing." Technically, "breathing" means that the fire has consumed all of the air in the house, and pressure is released in the form of smoke. Champion testified that he only went a few feet inside the front door of the house because the fire was too hot to venture any further. He stated that he yelled out several times, but did not receive a response. Champion testified that after his unsuccessful attempts to enter the house, the fire department arrived.

Several witnesses testified that they saw the defendant arrive at the house after the fire department. Witnesses who observed the defendant variably described his pace in approaching the house as "normal," "casual" and a "fast walking pace." Witnesses also stated that the defendant was not frantic, but repeatedly asked, "Where are my kids?" Several witnesses testified that the defendant made two unsuccessful attempts to enter the burning house. One witness stated that the defendant was easily restrained and did not struggle. The defendant eventually was taken to a nearby police car, where he continued to inquire about the location of his children. Another witness testified that the defendant asked whether he was under arrest when he was brought to the squad car.

Roger Brown, Linda Walls' next-door neighbor, testified that he had a brief conversation with the defendant at the scene of the fire. Brown stated that he attempted to console the defendant and told him not to worry because his children probably escaped. Brown testified that the defendant responded by saying that Linda had left the children there and "damn Johnny." The defendant further told Brown that "they were not looking in the right place." Brown testified that he thought that the defendant had been drinking because he could smell alcohol on his breath. Finally, Brown testified that the defendant eventually drove away in a car with someone.

Britton Warmoth, a resident of the neighborhood, testified that he videotaped the scene of the fire after the fire department arrived. The court eventually reviewed the video and admitted it into evidence.

Additional testimony showed that Johnny, Linda and Billie Jones returned to the burning house after the defendant had left. Testimony also showed that the defendant left the scene before the children's bodies were recovered from the fire.

James Saravino of the Kankakee fire department also testified. He stated that he arrived at the scene of the fire at 1:10 a.m. Saravino stated that heavy black smoke seeped from the eaves of the house and that flames from the fire had broken through the roof in the center of the house towards the back. He said that they first extinguished the fire under the stairs, which were completely burned out. He then entered the second floor of the house using a ladder which was placed outside of the second-floor windows. After searching the floor, he found a young girl lying face down in a closet. The three other children were found lying face up in the closet and cradling one another, completely covered in clothing. Saravino stated that all of the children were removed from the house. Finally, Saravino testified that it would have been "suicide" for the firefighters to enter the second floor without first controlling the seat of the fire on the first floor.

Several witnesses testified that they were unable to resuscitate the children at the scene. The children were then taken to the hospital. An emergency room physician who initially examined the children believed that one them may have been sexually abused. This information eventually was relayed to the fire and police investigators.

Pathologist Dr. William Robert Anderson performed autopsies on all of the children at approximately 10 a.m. on December 9, 1989, at Riverside Hospital. Dr. Anderson concluded that all of the children died from carbon monoxide poisoning with smoke inhalation from the fire. He further stated that the children were exposed to a high level of carbon monoxide for a short period of time, which allowed the concentration of the poisonous gas in their bloodstreams to rise very quickly. Dr. Anderson testified that the children were probably "unconscious within a few moments of exposure." He

stated that death would have ensued within a very few minutes after the children lost consciousness. Finally, Dr. Anderson concluded that there was no evidence of sexual abuse on any of the children.

The investigation of the cause of the fire began immediately after it was extinguished on December 9. The investigators agreed that there were two separate fires in the house and there were two different "points of origin." The most destructive fire occurred in the storage closet underneath the stairwell, which led to the second floor of the house. The investigators testified that a second, completely unrelated fire occurred in a pile of clothing near the dryer in the basement.

On December 9 and 10, the defendant made three separate, formal statements regarding his whereabouts on the night of the fire. The defendant gave his first statement during the early morning hours of December 9, after his brother, Frankie Howery, had taken him to Riverside Hospital for sedatives. Several firemen and policemen interviewed the defendant at approximately 6:30 a.m. while the defendant was in the comfort room of the hospital. The defendant then handwrote a statement describing his whereabouts prior to the fire. The first statement provided as follows.

Around 10:30 p.m. the defendant left his parents' home in Pembrooke and went to the Model Motel in Kankakee.[1] He left the motel and went to Food Expo to purchase a six-pack of beer. He then decided to go to Linda's house to have a drink with Johnny. The statement about what followed is substantially similar to the account provided by Linda, Johnny and Billie Jones. The defendant further stated that after Johnny and Jones left the house, he finished his beer and left. He

[1] An exhibit offered in connection with the defendant's post-trial motions shows that the motel log lists the defendant as having checked in at 10:39 p.m.

guessed that the children were asleep. He then went to Food Expo for another six pack of beer, but it was closed. From there he went to Park and Shop to purchase beer. After that, he encountered Demetrious Cobb, and got into Cobb's car. While they were driving, Cobb's car stalled. The defendant stated that as they pushed the car around the corner, he saw flashing lights by Linda's house. He stated that he went to Linda's house, but was prevented from entering.

The record shows that after the defendant made this initial statement, Robert Anderson, a Kankakee police officer, took him to Kankakee police station for questioning about the possible sexual abuse of the children. Anderson testified that at 9:25 a.m. on December 9, he typed a statement from the defendant, which the defendant then signed. The statement is similar to the handwritten statement given at 6:30 a.m., but is more detailed.

In his second statement the defendant said that he arrived at Linda's on the night of December 8, at 11 p.m. or shortly thereafter. The defendant also stated that it was after 12 a.m. when Johnny Walls and Billie Jones left the house. Finally, the statement provides that the defendant "did not have anything to do with the fire." The defendant stated that he did not touch or harm any of the children.

Anderson testified that after the defendant gave this second statement, he returned the defendant to Riverside Hospital in order to obtain samples from him. Anderson explained that at that point in the investigation, the police thought that the children had been sexually abused. Anderson stated that he also collected the defendant's shoes and pants. The defendant agreed to return to the police station on the following morning, Sunday, December 10.

Kankakee Assistant State's Attorney Larry Beau-

mont testified that he met with the defendant at 11:35 a.m. on Sunday, December 10, and the defendant signed a written *Miranda* waiver. Beaumont testified that the defendant denied going into the basement on the night of December 8, and denied any knowledge of who started the fire. The defendant also told Beaumont that he had warned Linda about faulty wiring in the house and about leaving clothing on the floor in the basement and underneath the stairs. Beaumont then asked the defendant how he knew that the fire started under the stairs and in the basement. The defendant responded that he had heard this information on the radio or TV the previous night. When Beaumont asked the defendant how he knew that the fire started in some clothing, the defendant had no explanation.

The defendant and Beaumont then went to a restaurant. Beaumont testified that while they were eating, the defendant admitted that he had gone into Linda's basement on the night of the fire. The defendant told Beaumont that after Johnny left, Justina came downstairs and went to the bathroom. According to the defendant, after Justina came out of the bathroom, she picked up an ashtray and said that she was going to dump it out. After Justina was gone for a short period of time, the defendant heard her laughing. Justina told the defendant that she was playing with the dog and the dog knocked over the ashtray in the basement. The defendant told Beaumont that he found the ashtray tipped over near a pile of clothing. The defendant stated that he did not see any cigarettes or ashes, so he picked up the ashtray and went back upstairs. Justina then went back upstairs to bed. The defendant further stated that before he left, he heard one of the children say "give that to Bernon." When he looked upstairs, Justina threw a lighter down to him.

Beaumont said that he and the defendant left the

restaurant and visited the scene of the fire for about 40 minutes. Beaumont testified that the defendant again told him that he had no idea how the fire underneath the stairs had started. Beaumont testified that the defendant then explained that he previously denied having been in the basement because it "looked bad and he did not want to get in trouble." The defendant then agreed to return to the police station and give a statement detailing these events.

The defendant's third formal statement was taken at 5:50 p.m. on December 10. The statement essentially reflects the information that the defendant gave to Beaumont. Beaumont's testimony indicated that while the defendant's statement was being typed, Beaumont told the defendant that he believed he knew how the fire started underneath the stairs. The defendant then told Beaumont that when he walked Justina back to bed, as he passed the bathroom he flipped a cigarette towards the bathroom. The defendant stated that he tried to throw the cigarette into the toilet, but never actually saw it go into the toilet.

Beaumont testified that he next informed the defendant that they were sending evidence to the lab to test for accelerants. The defendant then stated that two days before the fire, he had spilled gasoline on his pants in Linda's garage. He further stated that he went into the first-floor bathroom in Linda's home, wiped the gas from his boots with a T-shirt, and then threw the shirt into a laundry basket under the stairs. The defendant then stated that perhaps the cigarette fell into the basket containing the gas-filled T-shirt, thereby causing the fire.

Beaumont testified that the defendant read this third statement, made corrections and signed it. The defendant also made a written addition to the typed statement which provides:

"In order for this statement to be absolutely accurate, I must add that I do feel responsible for the fires because I was there and the last adult to leave. I feel that no matter how the fires really got started, I am responsible, not by intent to destroy a home nor to take lives but by my own negligence and in a sense carelessness. I am extremely sorry that I did not [sic] all these details in my previous statement. I am now will[ing] to take the full blame. I do not believe that anyone except myself was really responsible for the fire. I cannot say where the cigarette landed in the bathroom, but I did toss about a third of a cigarette into the bathroom, aiming it at the toilet, which I did not watch it go into the toilet. There have been times when I would miss and hit the [illegible] of an opening, but usually I am more cautious. On Saturday morning, 12-09-89, I was not that cautious. In fact, I knew the fire was my own fault the moment the firemen mentioned that started under the staircase (in the bathroom). Again I say there was no intent to destroy property or lives. The reason I gave the statement as I did previously was simply not to include anyone other than myself. Also, the questions were asked in a way that would seem to mean I did something on purpose. Again, no matter the consequences, I take full responsibility."

Beaumont testified that he then asked the defendant whether he started the fire with a lighter. At that point the defendant stated that there were more things that he would like to tell Beaumont, but the interview was terminated.

The State also presented the testimony of its expert witness, John DeHann, a criminalist for the California Department of Justice Bureau of Forensic Services in Sacramento. DeHann testified as to the cause and origin of the fire. He stated that he investigated the scene of the fire on December 15, 1989. He also reviewed several photographs of the scene. He explained that two separate fires occurred in the house—one in a pile of clothing in the basement and the other underneath the stairwell on the first floor of the house.

DeHann described the first-floor fire as a "high burn." This meant that the fire started in the storage room beneath the stairs and moved to the bathroom, burning across and up. DeHann stated that the area in and around the stairs suffered the most fire damage.

DeHann also testified that he investigated the fire in the basement. He stated that the fire damage there was confined to the area around the dryer, including a burnt pile of clothing. In examining the basement ceiling, DeHann noted that there was no direct fire damage. DeHann testified that this observation indicated that there was no fire extension from the first-floor fire.

DeHann testified that he ruled out accidental causes of the fire after conducting an extensive investigation. He further stated that the existence of two separate and unrelated fires in the home led him to believe that the fires were incendiary in nature, meaning that someone deliberately started the fires. He opined that the fires were started by a direct flame ignition, using an item such as a match or a lighter. DeHann also stated that it is more difficult to ignite a fire with a lit cigarette than with an open flame, but that it was possible to accomplish. He testified that smoldering combustion from a lit cigarette would take anywhere from a half an hour to two hours to occur. In contrast, a fire progresses much more quickly when an open flame ignition is involved. DeHann did not have an opinion as to which fire was started first.

DeHann testified that the fire under the stairs would have spread very quickly due to the wooden paneling, as well as the wood stairs. DeHann did not find positive, visual evidence that an accelerant was used to start either fire and he could not conclusively determine whether an accelerant was used. However, he also testified that if an accelerant was used, it may have burned away during the fire.

DeHann stated that in his opinion, the fire did not result from smoldering. He stated that given the length of time it would have taken the fire to burn through the stairs, the adults in the house would have discovered the fire before leaving.

Several additional witnesses testified that they inspected the scene of the fire on December 9, 1989. Two witnesses agreed that the pile of clothing in the basement had a peculiar smell. The investigators also agreed that none of the appliances in the basement malfunctioned and there was no sign of electrical problems. The investigators stated that all accidental sources for the fire were eliminated. The investigators believed that there were two points of origin for the fire, and there was no possibility of connection between the two. Investigators testified that they found fabric, presumably clothing, at the bottom of a white plastic laundry basket in the doorway area that led underneath the stairs.

Forensic chemists Mark Boese and Blair Schultz testified that they performed tests on various pieces of evidence collected, in order to determine whether accelerants were present. Boese testified that he tested the shoes that the defendant was wearing on the night of the fire by using a method known as gas chromatography. Boese stated that he detected a microliter of kerosene and an unidentified amount of a heavy petroleum distillate on the shoes. Heavy petroleum distillates are compounds such as kerosene, diesel fuel, charcoal starter fluid, home heating oil or fuel oil, but not gasoline. Schultz also said that he detected a heavy petroleum distillate on the defendant's pants. Schultz tested three aluminum malt liquor cans and two plastic drinking cups which were obtained from the scene of the fire. He found traces of heavy petroleum distillate on all. On cross-examination, Schultz admitted that there is no

way to determine the length of time that the accelerants would have been on the defendant's pants or any of the other tested items.

Finally, Joseph Ambrozich, a latent fingerprint examiner, testified that he was unable to detect fingerprints on anything tested. The State then rested.

On the defendant's behalf, the defendant's brother Frankie Howery testified that on the night of the fire the defendant appeared at his house sometime after midnight. Frankie stated that the defendant was "sobbing incoherently." The defendant told Frankie that his children had died in a fire, and repeatedly stated "my babies are dead." Frankie testified that the defendant was so distraught that he took him to Riverside Hospital for a sedative.

Frankie further testified that in the latter part of November or early December the defendant and another one of their brothers created a firebreak around their parents' trailer home in order to protect it from a forest fire. At the time, the defendant was living in the trailer home with his parents. Frankie testified that the defendant used kerosene to burn the leaves around the trailer. Finally, Frankie testified that the defendant was a loving father who overindulged his children.

George Washington, a member of the county board of Kankakee County, also testified on the defendant's behalf. Washington stated that he worked with the defendant on the county board. Washington stated that the defendant worked against gang crime in the community and was a concerned parent. He described the defendant as a nonviolent individual.

The defendant offered the testimony of three additional character witnesses: Reverend William Copeland, Arthur B. Kennedy and Willie Davis. All essentially testified that the defendant had a reputation as having a peaceful and law-abiding character, and loved his children.

The defendant also presented the testimony of Charles Neuf, as his expert in forensic science. Neuf testified that he conducts accident, fire and explosion investigations. He stated he is a member of the National Association of Fire Investigators. Neuf testified that he was contacted by attorney Sherri Carr to investigate the fire on the defendant's behalf. Neuf stated that he conducted a physical investigation of the fire scene approximately 11 months after the fire, on November 23 and 24, 1990. He agreed with DeHann that the point of origin for the fire was underneath the stairs on the first floor of the house. However, he disagreed with DeHann regarding the origin of the fire in the basement. Upon examining the basement, Neuf concluded that the fire directly beside the dryer was most likely the result of a fire from on top of the dryer. Neuf further opined that the basement fire originated from debris that fell from the basement ceiling during the 20- to 30-minute period when the fire was very hot. According to Neuf's theory, the debris from the first-floor fire may have caused sparks which became imbedded in clothing near the dryer and caused the clothing to ignite. Neuf stated that if the basement fire and the first-floor fire had ignited at the same time, then the fire would have progressed further than it did because there was plenty of oxygen in the basement, which would have allowed the fire to burn. Neuf did not have an opinion as to how the fire began underneath the stairs.

On cross-examination, Neuf stated that because the doors of the house were closed, when the house filled with hot air "it had to go down." He further testified that there were three to five feet of superheated air just below the surface of the basement ceiling, which came from the first floor. He then admitted, however, that heat always rises. Further, Neuf stated that he did not see unmelted or unburned items, such as a plastic alarm

clock, a cardboard detergent box, or a cardboard box, near the basement fire.

Finally, the defendant offered the stipulated testimony of Demetrious Cobb. Cobb stated that shortly after midnight on December 9, he saw the defendant walking across the Food Expo parking lot. He stated that the defendant asked him for a ride to the Model Motel where he was staying. While they were driving, the car stalled. At that point they looked south and saw flashing lights near Linda Walls' house. Cobb eventually restarted the car and drove to the fire.

Cobb stated that he saw two firemen holding the defendant by the arms. Cobb stated that he then took the defendant to a police officer and the officer told him that no one was in the house. The defendant then started to walk back towards the house and a police officer grabbed him. After a short struggle, the defendant asked if he was being charged and the police officer responded that he was not. Cobb then took the defendant to the car where the defendant asked Cobb to find a phone so that he could call his "wife." Cobb stated that the defendant then said, "I should have killed that bitch last night when he came out." Cobb also stated that he drove the defendant to the Model Motel and the defendant said, "Well, I know where my kids are now." Cobb described the defendant as controlled, conversational and not greatly controlled by liquor. The defense then rested.

In rebuttal, the State called fire investigator Billy Foster. Foster testified that he disagreed with Neuf that there was a three- to five-foot layer of superheated air just below the surface of the basement ceiling, which caused the basement fire. Foster stated that his opinion was based on the fact that there were several other flammable artifacts in the basement that were not burned. Foster said that the burning in the basement occurred from the floor upwards. Foster also stated that on

December 9, investigators observed a pile of unburned clothing on top of the dryer, and the light bulbs in the ceiling were intact. The State then rested.

### Trial Court's Ruling on Guilt

The trial court found the defendant guilty on all charges. The court stated that all of the evidence pointed to guilt beyond a reasonable doubt. The court found that the defendant clearly had a motive to commit the crimes, and referenced defendant's letter to Linda, his statements and his behavior. The court further found that if the fire had been an accidental, smoldering fire, as the defendant's statements imply, then the adults in the house that night would have discovered the fire before leaving. The court stated that the testimony of the State's expert, DeHann, showed that the fire was not accidental. The court also found the testimony of defense expert Neuf to be incredible. The court found that there was no connection between the fire underneath the stairs and the fire in the basement.

The court stated that the testimony regarding the defendant's reputation for peacefulness was contradicted by his abusive relationship with Linda Walls. The court constructed a time line on the night of the fire which demonstrated that the defendant had the opportunity to set the fires at Linda Walls' house on the night of December 8.

The court further noted that remnants of kerosene were found on the defendant's pants, and heavy petroleum distillate was found on the beer cans and cups from the kitchen. Finally, the court stated, "based upon all the evidence in this case, I find the defendant guilty in the manner and form charged in all counts of the indictment."

### Penalty Phase

The defendant waived his right to have a jury

determine his sentence. The State argued that the defendant was eligible for the death penalty on four grounds: (1) the victims were under the age of 12, (2) there were multiple victims, (3) the crime was cold and calculated and (4) the deaths occurred during the course of a felony. The State offered the defendant's birth certificate into evidence and asked the court to take judicial notice of the evidence presented at trial, and rested.

Defense counsel offered the testimony of three witnesses in mitigation. Their collective testimony, including cross-examinations, constitutes less than 13 pages of trial transcript. The defendant also briefly testified that he has no criminal record, and that charges stemming from the November 1989 incident with Johnny Walls were dropped.

At the close of the evidence presented at the sentencing phase, the trial court stated,

"I have an awful lot of questions, but nobody appears to be addressing them today."

The defense then rested. The court found the defendant eligible for the death penalty under all four aggravating factors cited by the State. The court deferred ruling on the aggravation/mitigation phase.

On February 21, 1991, the court rendered its decision. The court cited the paltry mitigation testimony. The court noted, "[T]he things cited in mitigation *** [are] basically no mitigation at all because I don't know what it's all about. Defense counsel wouldn't even tell me what it was." The court stated that the only "real" evidence offered in mitigation was that the defendant did not have any prior convictions. The court also cited the lack of psychiatric or psychological testimony. The court then sentenced the defendant to death. On March 27, 1991, the court issued its judgment order and sentencing decision.

Following the trial court's sentencing decision, the court granted the defendant's motion for the appoint-

ment of counsel for the purpose of filing post-trial and post-sentencing motions. However, due to defense counsel's delay in filing the post-trial motions, an appeal to this court was automatically perfected under Supreme Court Rule 606(b). Pursuant to the defendant's subsequent motion, on December 31, 1992, this court allowed a limited remand to permit the defendant to file post-trial and post-sentencing motions.

On December 21, 1993, the defendant filed six post-trial/sentencing motions as follows: (1) motion for acquittal, (2) motion for a new trial, (3) motion for a new sentencing hearing, (4) motion to vacate conviction and sentence and to dismiss indictment, (5) motion to appoint experts and (6) motion for writ of *habeas corpus* to permit the defendant to be moved to a more convenient prison location.

Beginning in July of 1994, the circuit court held an evidentiary hearing on the defendant's six post-trial/sentencing motions. The judge who presided over the trial recused himself because he was to testify during the hearing.

On January 18, 1995, the circuit court issued its memorandum opinion on the defendant's post-trial motions. The court denied the defendant's motions and upheld the court's earlier rulings with respect to the defendant's convictions and death sentence.

Now, on direct appeal before this court, the defendant requests a new trial on the grounds that (1) the trial court improperly shifted the burden of proof to him, (2) the trial court failed to fairly adjudicate the issue of the defendant's guilt or innocence because it ignored facts which support a finding of reasonable doubt, (3) the State failed to prove beyond a reasonable doubt that the defendant set the house on fire "knowing that such act created a strong probability of death," (4) the trial court violated the defendant's sixth amend-

ment right to counsel by refusing to read an *ex parte* communication from the defendant which allegedly contained a request for substitution of counsel and for failing to inquire into defendant's satisfaction with his representation, and (5) the trial court erred by refusing to appoint two additional attorneys at the trial stage of defendant's capital case.

In the alternative, the defendant requests that this court vacate his death sentence or order a new sentencing hearing.

The defendant raises the following issues with respect to the sentencing phase of his trial: (1) whether the statutory aggravating factors are supported by the evidence, (2) whether the trial court's comment at sentencing that the defendant failed to offer an explanation for why he set the fire violated his fifth amendment right against self-incrimination, (3) whether the evidence presented by the defendant in mitigation is sufficient to preclude the imposition of the death penalty, (4) whether the defendant was denied effective assistance of counsel by defense counsel's failure to investigate and present sufficient mitigation evidence, and (5) whether the Illinois death penalty statute is unconstitutional because it places the burden on the defendant to prove sufficient mitigating factors to preclude imposition of the death penalty.

For the reasons which follow, we affirm the defendant's convictions, but vacate his death sentence and remand for a new sentencing hearing.

## ANALYSIS

### I. Guilt Phase

#### A. *Alleged Shift in Burden of Proof*

The defendant contends that the circuit court improperly shifted the burden of proof to him to prove his innocence, thereby violating his due process rights.

In support of his contention, defendant relies on two remarks made by the court in delivering its ruling on guilt. The two remarks at issue are as follows:

(1) "The court having reviewed all the testimony in this case, some three legal-sized pads of notes, all the exhibits that were admitted into evidence, reviewed the videotapes, the court finds, after a long, hard search, that there is no evidence of any kind to support a verdict of not guilty in this case. I looked at all this evidence from almost every angle that I could possibly look at it. It all points to a verdict of guilty beyond a reasonable doubt."

(2) "I thought maybe looking at some of the testimony that was presented by the defendant I could find something that would assist the court and perhaps help the court from not having to find him guilty. But there's nothing there."

The defendant argues that these statements demonstrate that the court deprived him of his right to be presumed innocent. See ILCS 720 5/3—1 (West 1992); *People v. Weinstein*, 35 Ill. 2d 467 (1966). The defendant maintains that the court based its finding of guilt on his inability to present persuasive evidence of innocence, and consequently, the court failed to consider whether the evidence presented by the State was sufficient to establish his guilt beyond a reasonable doubt. The defendant acknowledges that the court referred to the reasonable doubt standard of proof. However, he maintains that because the court referred to two conflicting standards of proof, the court is presumed to have followed the incorrect standard. See *People v. Haywood*, 82 Ill. 2d 540, 545 (1980) (when conflicting jury instructions are given, one of which is a correct statement of the law and the other is incorrect, the error is not harmless); see also *People v. Virella*, 256 Ill. App. 3d 635, 638-39 (1993) (reversible error where three times the circuit court expressly declared that the totality of the State's case was "clear and convincing"); *People v. Kluxdal*, 225 Ill. App. 3d 217, 223-24 (1991). The defendant maintains

that the trial court's comments in this case parallel the prosecutor's comments in *People v. Weinstein*, 35 Ill. 2d 467 (1966), which were held to be reversible error. As such, the defendant argues that he is entitled to a new trial.

The State counters that the defendant has inappropriately extricated the remarks at issue from the totality of the trial court's ruling. The State maintains that in context, the comments are clearly an expression of the court's belief that the defense theory was implausible in light of the strength of the State's evidence. The State argues that the remarks do not show that the trial court shifted the burden of proof to the defendant.

The State also notes that the post-trial court found that the remarks cannot be construed as shifting the burden of proof. The State argues that the post-trial court determined that the trial judge was expressing his disappointment that no evidence had been proffered to refute the State's formidable though largely circumstantial proof of guilt beyond a reasonable doubt.

Constitutional due process rights require that the burden of proving all of the elements of the offense charged beyond a reasonable doubt rests on the State. *Sullivan v. Louisiana*, 508 U.S. 275, 124 L. Ed. 2d 182, 113 S. Ct. 2078 (1993); *In re Winship*, 397 U.S. 358, 364, 25 L. Ed. 2d 368, 375, 90 S. Ct. 1068, 1073 (1970); *People v. Lambert*, 104 Ill. 2d 375 (1984). The burden of proof never shifts to the accused, but remains with the State throughout the trial. *Mullaney v. Wilbur*, 421 U.S. 684, 701, 44 L. Ed. 2d 508, 520, 95 S. Ct. 1881, 1890-91 (1975).

Additionally, the trial court is presumed to know the law and apply it properly. However, when the record contains strong affirmative evidence to the contrary, that presumption is rebutted. *Virella*, 256 Ill. App. 3d at 638; *Kluxdal*, 225 Ill. App. 3d at 223. Thus, the specific question for this court is whether the record in the case

at bar contains strong affirmative evidence that the trial court incorrectly allocated the burden of proof to the defendant in this case.

With respect to the court's remark that "there is no evidence of any kind to support a verdict of not guilty," we note that the trial court stated that it reviewed all of the trial testimony and all of the exhibits that were admitted into evidence. At trial the defendant presented a reasonable doubt theory and called several witnesses to testify in support of this theory. Thus, the trial court's review of the record entailed consideration of the defendant's reasonable doubt defense and the testimony of his witnesses.

We determine that the statement of the court merely shows that it considered and rejected the defendant's reasonable doubt defense. The court's remark does not constitute affirmative evidence that the court improperly diluted the State's burden of proof or shifted it to the defendant.

The court also stated:

"I thought maybe looking at some of the testimony that was presented by the defendant I could find something that would assist the court and perhaps help the court from not having to find him guilty. But there's nothing there."

When considered in context, this statement demonstrates that the court made a marked effort to support the various theories set forth by the defendant, rather than summarily dismiss them as incredible. For example, although the court rejected defense expert Neuf's testimony as incredible, it nonetheless considered Neuf's theory that the fire in the basement was secondary to the fire on the first floor. The court tested the theory, but ultimately determined that it failed. Additionally, the court attempted to give credence to the defendant's statements which indicate that he threw a lit cigarette towards the toilet in the bathroom, but never watched

to see whether it went into the toilet. The defendant's statement implies that the fire began as an accidental smoldering fire. The court examined this theory, but ultimately determined that it failed based on other evidence in the record.

Additionally, in delivering its ruling, the trial court expressly relied on affirmative evidence presented by the State. Specifically, the court commented on the evidence of motive, the State's expert testimony regarding the origin of the fires, the physical evidence which showed that the defendant's pants contained an accelerant and the defendant's own statements to the police and fire investigators which showed that he had the opportunity to start the fire.

We conclude that when the court's consideration of the defense theories are viewed in the larger context of the court's comments on the strength of the State's evidence showing motive and opportunity, the court's statements do not show that the court improperly shifted the burden of proof to the defendant.

We also reject the defendant's contention that the prosecutorial comments at issue in *Weinstein* parallel the trial court's statements in the case at bar, thus mandating a new trial. In *Weinstein*, the prosecutor represented to the jury, more than five times, that the defendant had the burden to present evidence creating a reasonable doubt, and argued that the evidence did not create such doubt. *Weinstein*, 35 Ill. 2d at 470-71. This court held that the prosecutor's comments to the jury improperly shifted the burden of proof to the defendant and constituted prejudicial error.

In the bench trial in the case at bar, unlike the jury trial in *Weinstein*, the trial court, serving as the finder of fact, is presumed to know the law. The trial court in this case was free to comment on the implausibility of the defense theory, provided that it was clear that the

court applied the proper burden of proof in finding the defendant guilty. The court's efforts to sustain the defense theory cannot be viewed as improperly diluting the State's burden of proof and placing it onto the defendant. For these reasons, we reject the defendant's contention and find that the court's remarks do not require a new trial.

## B. *Reasonable Doubt Defense*

Initially, we address the defendant's argument that under *People v. Mitchell*, 152 Ill. 2d 274 (1992), his due process rights were violated because the trial court, by ignoring crucial facts, did not fairly adjudicate the issue of guilt or innocence. In *People v. Mitchell*, the trial court expressly based its denial of the defendant's motion to suppress his confession on its belief that defendant never testified that he felt he was not free to leave or was denied permission to leave police custody. Contrary to the court's understanding, the record showed that the defendant in fact did testify that he was not free to leave police custody. Because the court erroneously did not consider that the defendant testified regarding custody, the court failed to resolve the issue of the defendant's credibility on this pivotal issue. *Mitchell*, 152 Ill. 2d at 322-23.

On appeal, this court held that the defendant's due process rights were violated because the trial court clearly failed to recall the crux of the defendant's testimony regarding the decisive issue of whether he was free to leave police custody. *Mitchell*, 152 Ill. 2d at 326. This court reasoned that the defendant's testimony, if believed, would have supported his claim of illegal seizure because the officers admittedly had no probable cause to arrest him. Further, this court determined that the trial court deprived the defendant of his due process right to have his claim fairly adjudicated. Ultimately, however, this court found the error to be harmless in

light of other evidence in the case which supported the finding of guilt. *Mitchell*, 152 Ill. 2d at 328-30.

The defendant attempts to analogize the facts in the case at bar to the facts and holding in *Mitchell* with extensive and detailed arguments regarding the manner in which the trial court misinterpreted the evidence in this case. The defendant demarcates three allegedly erroneous assumptions made by the trial court: (1) the time that the fire started, (2) that the defendant was present at Linda Walls' house when the fire started and (3) that the evidence foreclosed the possibility that persons other than the defendant were present at Linda's house after the defendant left and before the fire started.

Additionally, the defendant provides this court with an alternative chronology of events based on his interpretation of the record and by his reference to Linda Walls' testimony that she and Keith Ward left the house at 11:30 p.m. on the night of the fire. The defendant maintains that the court ignored Linda's testimony which is the "best evidence" or the "most reliable indicator of chronology" of the events immediately preceding the fire. He argues that because Linda's testimony is not contradicted, is not inherently improbable and is unimpeached, the trial court erred by ignoring it. See *People ex rel. Brown v. Baker*, 88 Ill. 2d 81, 85 (1981).

Initially, we note that Linda Walls was unable to precisely recall the time that she and Keith left the house on the night of December 8. Contrary to the defendant's contention that Linda definitely left the house at 11:30, Linda testified as follows:

"Q. You feel you left the house about 11:30?

A. 11:30, 12:00, because I never go to a party early anyway ***."

Linda also testified that she really did not know the exact time that she and Keith arrived at Bradley Gardens.

After having reviewed the record in this case, as well as the defendant's lengthy interpretation of the evidence, we determine that *People v. Mitchell* is inapposite. The present record does not support a finding that the trial court ignored crucial evidence, as the court did in *Mitchell*. Unlike the court in *Mitchell*, the trial court in this case did not overlook evidence which may be characterized as the crux of the defense theory of factual innocence.

The trial court in this case expressly stated that it reviewed the entire trial, including testimony and exhibits. More than 30 witnesses testified at trial and gave similar, but varying, accounts of the precise time frame for the events on the night of December 8 and the early morning hours of December 9. The defendant acknowledges that a precise chronology of the events preceding the fire is "difficult to reconstruct."

We determine that the trial court's attempt to estimate a time frame based on the trial testimony does not affirmatively establish that it ignored crucial evidence. The factual findings of the trial court which the defendant labels as its "three erroneous assumptions" are in fact based on reasonable inferences which may be drawn from the evidence. We note that "[t]he trial court was not required to search out a series of potential explanations compatible with innocence and elevate them to the status of reasonable doubt." *People v. Arndt*, 50 Ill. 2d 390, 396 (1972). We conclude that the record does not show that the trial court violated the defendant's due process rights by ignoring crucial evidence.

The defendant further contends that the trial court's finding of guilt was "clearly erroneous." He entreats this court to adopt a clearly erroneous standard of review for evaluating the trial court's factual findings. See T. O'Neil & S. Brody, *Taking Standards of Appellate Review Seriously: A Proposal to Amend Rule 341*, 83 Ill. B.J. 512 (1995).

This court has consistently held that a criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory as to create a reasonable doubt of the defendant's guilt. *People v. Gilliam*, 172 Ill. 2d 484, 515 (1996); see also *People v. Moore*, 171 Ill. 2d 74 (1996); *People v. Eyler*, 133 Ill. 2d 173, 191 (1989). The standard for reviewing the sufficiency of the evidence in a bench trial is the same as it is in a jury trial. See generally *People v. Collins*, 106 Ill. 2d 237 (1985). The question of whether the conviction may be sustained depends on "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2788 (1979); *Gilliam*, 172 Ill. 2d at 515. The relevant inquiry is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson*, 443 U.S. at 318-19, 61 L. Ed. 2d at 573, 99 S. Ct. at 2788-89. Under this standard of review, it is the responsibility of the trier of fact to "fairly *** resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319, 61 L. Ed. 2d at 573, 99 S. Ct. at 2789.

It is undisputed that the evidence against the defendant was largely circumstantial. However, the reasonable doubt standard of review articulated above applies irrespective of whether the evidence is direct or circumstantial. *Gilliam*, 172 Ill. 2d at 515; *Moore*, 171 Ill. 2d at 95.

The defendant argues numerous inferences which may be drawn from the testimony, which he claims are better and more reliable than the conclusions reached by the trial court. He urges this court to adopt a clearly erroneous standard in reviewing the evidence and the

inferences drawn by the trial court. However, the only relevant inquiry on review is whether the evidence contained in the record reasonably supports a finding of guilt beyond a reasonable doubt, as stated in *Jackson v. Virginia*, 443 U.S. 307, 61 L. Ed. 2d 560, 99 S. Ct. 2781 (1979).

The testimony against the defendant included evidence of opportunity and motive. The court also heard testimony regarding the defendant's inconsistent statements following the fire and the presence of an accelerant on the defendant's clothing on the night of the fire. The record further shows that the defendant had ready access to an accelerant.

We have considered all of the defendant's arguments and reviewed all of his citations to the record. After reviewing the entire record in the light most favorable to the prosecution, we cannot say that the evidence was so improbable or unsatisfactory that no rational fact finder could have found the defendant guilty beyond a reasonable doubt of arson and first degree murder.

Finally, we reject the defendant's contention that the post-trial court abused its discretion because it failed to recognize its power to grant him a new trial. We have reviewed the trial court's memorandum opinion and we conclude that it does not establish that the court was unaware of its ability to grant the defendant a new trial.

C. *Proof of Knowing Murder Under Section 9—1(a)(2)*

The defendant argues that assuming that he started the fires, he nonetheless must be acquitted of the knowing murder charges (720 ILCS 5/9—1(a)(2) (West 1992)) because the State conceded that it failed to prove beyond a reasonable doubt that he set the fire "knowing such act created a strong probability of death." Specifically, the defendant directs this court to the State's rebuttal argument which provides in part:

"His [the defendant's] actions and words at the scene

are even more indicative of his state of mind. That godd-amn Johnny, he said, blaming Johnny Walls because when Johnny Walls left he said he'd be back shortly. And this defendant left believing that, counting on that, that Johnny Walls would be back shortly and blamed Johnny Walls for not coming back in time to rescue the children.

\* \* \*

The defendant's actions at the scene as the firemen were fighting the fire and afterwards at his brother's house and at the hospital are indicative of anguish, I'll admit that. Anguish that his plans had gone awry and that the fires that he had set had caused the death of those four children, that Johnny Walls hadn't come back in time to rescue them.

\* \* \*

And when he was left alone with those four children upstairs, three of them his, it all came together. Johnny Walls lives down in the basement. Start the first fire down there. Another one upstairs. Johnny will be back shortly. That fire got out of control, it got out of hand. The flames didn't reach those four children, but the smoke did."

According to the defendant, the State's rebuttal argument constitutes a judicial admission that the defendant did not have the requisite intent for knowing murder under section 9—1(a)(2). See *Lowe v. Kang*, 167 Ill. App. 3d 772 (1988) (statements during closing argument may serve as the basis for a judicial admission); *Giamanco v. Giamanco*, 111 Ill. App. 3d 1017 (1982); *Rosbottom v. Hensley*, 61 Ill. App. 2d 198 (1965). The defendant maintains that under the State's view of the evidence, there was no indication that he was practically certain that death or great bodily harm would result from his actions, and therefore he was merely reckless in setting the fires. See 720 ILCS 5/4—6 (West 1992) (a reckless person "consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow \*\*\* and such disregard constitutes a gross deviation from the standard of care which a rea-

sonable person would exercise in the situation"). Finally, the defendant argues that regardless of the manner in which this court interprets the State's rebuttal argument, there is insufficient evidence to sustain his conviction for knowing murder.

The State responds that the defendant waived the issue concerning any error in the prosecutor's rebuttal arguments by failing to raise the issue in the trial court. Waiver aside, the State responds that it is clear that the purpose of the rebuttal remarks was to refute the defendant's contention that he did not possess the requisite mental state for knowing murder because he did not subjectively intend for the children to die. *Lowe*, 167 Ill. App. 3d at 777 (whether or not a statement by an attorney is a judicial admission depends upon the circumstances of the individual case and the meaning of the statement within the context in which it is found). The State also argues that to the extent that its rebuttal can be read to mean that the defendant did not intend death to result, the evidence is nonetheless sufficient to support a finding of knowing murder under section 9—1(a)(2). See 720 ILCS 5/9—1(a)(2) (West 1992).

While it is true that the defendant failed to raise the issue concerning the State's rebuttal argument in the trial court, we take the opportunity to address his contention briefly. Section 9—1(a)(2) provides in part:

> "A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death
> \*\*\*
> \*\*\* he knows that such acts create a strong probability of death or great bodily harm to that individual or another[.]" 720 ILCS 5/9—1(a)(2) (West 1992).

As the State accurately points out, the prosecutor's rebuttal remarks were made following the defendant's argument that he did not possess the necessary *mens rea* for murder. During closing argument, defense

counsel argued that the defendant's attempt to enter the burning house showed that he was not "a man who has planned *** with full premeditation, to kill his children." Defense counsel also stated that "at no time did [the defendant] ever tell [the investigators] that he planned to set these fires, two of them, to kill his children ***."

In rebuttal, the prosecutor acknowledged the truth of the above argument and noted that the defendant was not charged with specifically intending to kill the children. Rather, he was charged with four counts of knowing murder under section 9—1(a)(2) and four counts of felony murder under section 9—1(a)(3). The State argued that the defendant's act of setting a fire underneath the only means of egress from the second floor where the children slept invites an inference that the defendant knew that there was a strong probability that death or great bodily harm would result.

After having reviewed the entire text of the State's rebuttal argument, in conjunction with the defendant's closing argument, we find that the prosecutor's statements do not constitute a judicial admission that the defendant did not commit knowing murder under section 9—1(a)(2). The problematic comments concern the State's reference to the defendant's subjective belief that Johnny Walls was to blame for failing to return to the house in time to rescue the children. However, the State was making the point that regardless of whether the defendant subjectively hoped that Johnny would return, his actions still bespeak knowing murder.

We next consider the defendant's argument concerning the sufficiency of evidence of knowing murder. In order to prove murder, it is not necessary to show that the defendant had a specific intent to kill or do great bodily harm or that he knows with certainty that his acts will achieve murderous results. *People v. Bartall*, 98 Ill. 2d

294 (1983); see also *People v. Latimer*, 35 Ill. 2d 178 (1966). The requisite mental state for murder under section 9—1(a)(2) may be inferred from the facts and circumstances of the evidence. *People v. Oaks*, 169 Ill. 2d 409, 458 (1996); *People v. Tye*, 141 Ill. 2d 1, 15 (1990); *Bartall*, 98 Ill. 2d at 307. It is sufficient to show that the defendant voluntarily and willfully committed an act, the natural tendency of which was to destroy another's life. *Oaks*, 169 Ill. 2d at 458; *Bartall*, 98 Ill. 2d at 307. A defendant's intent may be implied from the character of the act. *Latimer*, 35 Ill. 2d at 182-83.

In *People v. Bartall*, 98 Ill. 2d 294, 307 (1983), the defendant fired two gun shots into a parking lot and killed a woman. He maintained that he merely acted recklessly in firing his gun and that the State failed to prove beyond a reasonable doubt that he knew that anyone was standing in the parking lot. The defendant argued that unless he knew that people were in the parking lot, he could not have known that his actions created a "strong probability" of death or great bodily harm that would justify his murder conviction.

This court rejected the defendant's challenge to the sufficiency of the evidence and explained that whether a defendant is guilty of murder because his acts create a "strong probability" of death is a question for the trier of fact. *Bartall*, 98 Ill. 2d at 307. We noted that the defendant gave a statement in which he claimed that he looked into the parking lot before firing and saw no one. However, other evidence in the record would have permitted the jury to draw a contrary inference. This court then held that there was sufficient evidence for the trier of fact to infer that the defendant voluntarily fired a gun in the direction of a group of people he saw standing in the parking lot, and therefore the evidence supported a guilty verdict for knowing murder.

The defendant argues that in the present case the

State failed to prove that he was consciously aware that setting the fires was practically certain to cause death or great bodily harm. He maintains that in order to prove *mens rea* in this case, proof of "some degree of risk is not enough" to support a knowing murder conviction. He further maintains that because the record undeniably shows that Johnny Walls told him that he would return in 15 minutes, the defendant could not have known that his actions created a strong probability of death or great bodily harm. We disagree.

Regardless of whether the defendant subjectively believed that the children would die as a result of his setting fires in their home, the record contains ample facts which support the trial court's finding that the defendant committed knowing murder. Knowledge is defined in the Criminal Code as an awareness that specific conduct is practically certain to produce a given result. 720 ILCS 5/4—5(b) (West 1992). In this case, the trial court found that the defendant started two fires on the lower floors of a house, late at night, in a home while children slept on the second floor. The record further shows that the arsonist positioned one of the fires underneath the only set of stairs which led to the children's second-floor bedrooms. At the time the fires started, no adults other than the defendant were in the house. The defendant then left the children alone in the house, only to return after the fire department had arrived.

We agree with the State that the defendant's unreasonable belief that Johnny Walls would return to the house renders him no less guilty of knowing murder than a defendant who fires a gun at a police officer with the subjective hope that the officer's bullet-proof vest will prevent the officer's death.

Additionally, the trial court found that when the defendant returned to the fire, he did not struggle to enter

the house as claimed by his attorney. The court expressly found that the defendant's attempts to enter the burning home were weak or contrived. The record in this case supports a finding that the defendant knew with reasonable certainty that his actions would cause death or great bodily harm. Therefore, we reject the defendant's contention that the State failed to prove him guilty of knowing murder.

### D. *Sixth Amendment Right to Counsel*

The defendant contends that he was deprived of his sixth amendment right to counsel because the trial court failed to read a letter from him which expressed his dissatisfaction with his trial counsel, Earl Washington. In December 1990, the trial judge received the letter from the defendant, but did not open it. Instead, the judge retained the unopened letter until January 8, 1991, when the following colloquy occurred in open court:

"THE COURT: *** [B]ack in December I received a letter from the defendant which was never opened. I sent a reply to him with copies to both counsel advising them that I would not do anything with that letter prior to today because I didn't think that the court should be receiving ex parte communications and especially without his counsel knowing about it.

What should I do with this letter now? Have you discussed this with—

DEFENDANT: I'd like to receive it back. It was written at a time when I was quite confused about some things concerning the case. It wasn't anything to cause any problems with anyone, pretty much an explanation of how I feel.

THE COURT: You want it received back or do you want it delivered to the Court Reporter to hold unopened for the future?

THE DEFENDANT: I prefer to have it back."

The judge then returned the defendant's letter to the defendant, unopened and unread. The court made no further inquiry concerning the contents of the letter.

On appeal, the defendant maintains that the record shows that the court "had some inkling" that the letter might involve an expression of dissatisfaction with Washington. The defendant cites several facts contained in the record which support his "inkling" theory, including (1) the trial court's conversation with the defendant's sister, Brenda Lee, that she and the family were dissatisfied with Washington's representation, (2) the court's awareness of the defendant's financial constraints, including a fee dispute between Washington and the defendant's family, and (3) the court's threat to Washington that it would replace him with a public defender upon the request of the defendant. The defendant argues that these factors show that the court should have opened and read the letter, inquired into the nature of his problems with Washington, and advised him of his right to seek new counsel. Absent these actions on the part of the court, the defendant maintains that he did not knowingly and intelligently waive his right to substitution of counsel. Therefore, he contends that he was deprived of his sixth amendment right to counsel, and must receive a new trial.

The defendant acknowledges that the issue concerning his December 1990 letter was not raised in his post-trial motion. However, he claims that this court nonetheless should review the issue under the plain error doctrine because the evidence in this case was closely balanced and the issue implicates fundamental fairness. See 134 Ill. 2d R. 615(a); *People v. Young*, 128 Ill. 2d 1, 46-47 (1989); *People v. Szabo*, 113 Ill. 2d 83 (1986). Alternatively, the defendant maintains that his post-trial counsel was ineffective for failing to raise the issue in his post-trial motion.

We agree that the defendant has waived the issue concerning the letter due to his failure to raise it in his post-trial motion. *People v. Herrett*, 137 Ill. 2d 195, 209

(1990); *People v. Stewart,* 104 Ill. 2d 463, 488 (1984). For the reasons which follow, we further determine that the plain error doctrine should not be applied in this case. Defendant contends that the evidence was closely balanced because the evidence against him was circumstantial. The defendant also points out that during the post-trial hearing, he set forth an alternative and viable theory that Johnny Walls and Billie Jones returned to the house and started the fires after the defendant left. During the post-trial motion phase of the proceedings below, the defendant proffered a theory that Linda Walls, Johnny Walls and Billie Jones conspired to set the fires in order to collect money from an insurance policy. The post-trial court's ruling indicates that it rejected this theory.

We do not agree with the defendant that this is a close case simply because it was based largely on circumstantial proof of guilt. The defendant made three separate statements in the days immediately following the fire. According to the testimony of Larry Beaumont, the defendant modified his statements as he was told more about the fire investigation. For example, when Beaumont told the defendant that the police and fire investigators planned to test for accelerants, the defendant told Beaumont that prior to the fire he had spilled gasoline in Linda's garage, wiped his gas-filled shoes with a T-shirt and then threw the shirt into a laundry basket underneath the stairs. Also, the defendant told Beaumont that he warned Linda not to leave clothes under the stairs. However, the defendant was unable to explain how he knew that the fire started in clothing underneath the stairs.

Additionally, the State presented extensive evidence regarding the cause of the fire, including the testimony of an expert and numerous fire investigators. All of the State's witnesses who testified regarding the cause of

the fires agreed that the fires were incendiary in nature and all accidental causes were ruled out. The State's expert, John DeHann, testified that the existence of two unrelated fires also indicated that the fire resulted from arson. Although DeHann could not conclusively determine whether or not accelerants were used in connection with the fire, other experts testified that the tests conducted on evidence obtained from the scene showed the presence of an accelerant. Traces of an accelerant were found on the defendant's clothing. By defendant's own statement, he was the last adult to leave the house on the night of the fire.

Further, the record does not support the defendant's theory that Johnny Walls and Billie Jones returned to the house after he left and started the fire. Both Walls and Jones testified that they left the defendant alone at Linda's home, drove around for a brief time and then went to Nightingales, where they drank beer and met Oscar Stancil. Nothing in the record supports an inference that they instead returned to Linda's home and started the fires or had a motive to do so.

In contrast, the State presented clear evidence that the defendant had a motive to set the fires in retaliation against Linda for rejecting him and becoming involved with Keith Ward. Linda testified at length about her abusive relationship with the defendant. Linda also testified to statements made by the defendant several days prior to the fire in which he threatened to kill anyone else in her life and in which he indicated that he did not want anyone else in the children's lives. The record shows that the defendant knew that on Saturday December 9, Keith Ward was to drive Linda and the children to Chicago for a Christmas party.

We determine that on the record before us, the evidence in the case at bar cannot reasonably be regarded as closely balanced. Therefore, review of the defendant's claim under the plain error doctrine is not warranted.

We note that we may review the defendant's claim if the error is so fundamental and of such magnitude that the defendant was denied a fair trial. *People v. Herrett*, 137 Ill. 2d 195 (1990). The rule is invoked where it is necessary to preserve the integrity of the judicial process and insure that a fair trial is provided. *Herrett*, 137 Ill. 2d at 210.

The sixth amendment guarantees the right to assistance of counsel. U.S. Const., amend. VI. This guaranty includes the right to effective representation by competent counsel, as well as the right to select and be represented by one's chosen attorney. *People v. Holmes*, 141 Ill. 2d 204, 217 (1990); see also *Powell v. Alabama*, 287 U.S. 45, 77 L. Ed. 158, 53 S. Ct. 55 (1932). However, the decision to grant or deny a motion for substitution of counsel is within the trial court's discretion. See *People v. Robinson*, 254 Ill. App. 3d 906 (1993); *People v. Royark*, 215 Ill. App. 3d 255 (1991).

The defendant maintains that *United States v. Zillges*, 978 F.2d 369, 371 (7th Cir. 1992), and *Bland v. California Department of Corrections*, 20 F.3d 1469 (9th Cir. 1994), support his claim that the trial court abdicated its discretion. In *Bland*, the court held that the trial court deprived the defendant of his right to obtain counsel of his choice by failing to inquire into the nature of the defendant's dissatisfaction. The court determined that the statements of the defendant's attorney regarding the defendant's wishes, as well as the trial court's response, showed that the defendant made a valid request for substitute counsel. The court reasoned that because the trial court summarily dismissed the defendant's request without further inquiry into his reasons, an abuse of discretion occurred.

Similarly, in *Zillges*, the court received a letter from the defendant and read it. The letter expressed the defendant's dissatisfaction with his retained counsel

and requested new counsel. At the opening of trial, the court responded to the defendant's letter by summarily dismissing it without inquiring about defendant's dissatisfaction. Later, the court asked the defendant if he had anything to say about his attorney's continued representation of him. The defendant expressed his satisfaction with counsel and the trial proceeded.

On appeal, the court in *Zillges* reasoned that when faced with a nonspecific substitution motion, a trial court must make a proper inquiry into the reasons for defendant's dissatisfaction. If the request is timely and the court fails to inquire, an abuse of discretion may be found. Ultimately, the *Zillges* court concluded that although an abuse of discretion occurred, the error was harmless. *Zillges*, 978 F.2d at 372.

We determine that neither *Bland* nor *Zillges* provides a basis for imposing a duty on the trial court to open and read *ex parte* correspondence received from a defendant. Nor do these cases require the court to make an inquiry where it may have an "inkling" that the defendant is dissatisfied with counsel. The primary distinguishing feature of *Bland* and *Zillges* is the trial courts' knowledge of the defendants' desire to substitute counsel. In those cases, the court's knowledge triggered a duty to make the appropriate inquiry into the nature of the defendant's dissatisfaction.

In contrast, in the case at bar, the record does not support a finding that the trial court knew that the defendant wished to substitute counsel. The defendant's "inkling" theory is not supported by law. Brenda Lee's expression of dissatisfaction with Washington's representation does not suggest that the defendant was dissatisfied. Likewise, the court's knowledge that the defendant was having financial difficulties does not constitute knowledge that the defendant wished to remove Washington as his counsel. We determine that

the court did not abuse or abdicate its discretion when the court, without knowledge of the letter's contents, gave the defendant the option of having the letter returned to him or having the court read the letter.

We further reject the defendant's argument that he did not knowingly and intelligently waive his right to substitution of counsel. Upon requesting the return of the letter, the defendant told the court that he had written the letter when he was "confused" and that the letter was merely an explanation of his feelings. We also agree with the post-trial court's determination that the defendant was well aware of his right to terminate Washington's services. The court noted that the defendant was originally represented by Edward Lee, but terminated Lee's services to enlist Washington. We view the defendant's decision to take back the letter as an indication the defendant changed his mind about discharging Washington. For these reasons, we determine that the trial court's decision to allow the defendant to determine the fate of his letter did not adversely impact the fundamental fairness of the proceedings. Thus, we decline to invoke the plain error doctrine.

Additionally, we hold that the defendant's claim that his post-trial counsel was ineffective for not raising the issue is without merit. In order to prove a claim for ineffective assistance of counsel, the defendant must satisfy the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). The defendant must show that his counsel's performance fell below an objective standard of reasonableness, and that there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different. *Lockhart v. Fretwell*, 506 U.S. 364, 122 L. Ed. 2d 180, 113 S. Ct. 838 (1993); *Strickland*, 466 U.S. at 689-94, 80 L. Ed. 2d at 694-97, 103 S. Ct. at 2065-68.

We cannot conclude that post-trial counsel was ineffective for failing to raise the issue concerning the court's disposition of the letter. It was reasonable for post-trial counsel to conclude that the defendant's decision to have the letter returned to him settled the issue of the trial court's duty to inquire. Therefore, we reject the defendant's contention that the trial court violated his sixth amendment right to counsel, or that the defendant did not make a knowing and intelligent waiver of his rights.

### E. *Appointment of Additional Counsel*

The defendant argues that he should be awarded a new trial because the trial court erred by denying his request for the appointment of additional counsel. The record contains an affidavit of indigency signed by the defendant. Prior to trial, the defendant's counsel, Earl Washington, informed the court that the defendant was indigent and requested that the court appoint two additional attorneys to assist him at trial. The trial court denied the request.

In support of his argument, the defendant directs us to Supreme Court Rule 607(a), which provides in pertinent part:

"When a death sentence has been imposed, the court may appoint two attorneys, one of whom it shall designate as the responsible attorney and the other as assistant attorney for the appeal. Compensation and reimbursement for expenses of appointed attorneys shall be as provided by statute." 145 Ill. 2d R. 607(a).

The defendant argues that Supreme Court Rule 607(a) must be read *in pari materia* with the statutes governing the appointment of counsel in capital cases. See, *e.g.*, 725 ILCS 5/113—3(b), (d), 113—3.1 (West 1992). He maintains that if the statutes are read together, they show that two attorneys must be appointed for the trial phase in a capital case. Finally, the defendant suggests that Illinois law should comport with the American Bar

Association's recommendation that two qualified attorneys be assigned to represent the defendant in a trial where the death penalty is sought.

The State responds that this issue is waived because the defendant failed to raise it in his post-trial motion. As to the merits, the State maintains that the defendant was represented by privately retained counsel, Earl Washington. The State points out that Washington indicated on the record that he would continue to represent the defendant, even it he had to do so *pro bono*. The State further notes that the record shows that Washington's associate counsel Patricia Bender also represented the defendant during the trial. Thus, the State maintains that no error occurred. We agree.

Although section 113—3 of the Code of Criminal Procedure of 1963 provides for the appointment of counsel in the event of indigency, the defendant's privately retained counsel indicated that he would represent the defendant even if it meant doing so *pro bono*. Additionally, section 113—3 does not require the appointment of more than one attorney for a defendant at the trial stage. We reject the defendant's contention that Supreme Court Rule 607(a) dictates otherwise in a trial context. Rule 607(a) governs the appellate process and permits the appointment of two attorneys on appeal. We conclude that despite the defendant's subsequent indigency, he was not deprived of his right to counsel.

For the reasons stated, we reject the defendant's contentions with respect to the guilt phase of his trial and affirm his convictions.

## II. Penalty Phase

The defendant raises five issues concerning the sentencing phase of his trial: (1) whether the statutory aggravating factors are supported by the evidence, (2) whether the trial court's comment at sentencing that the defendant failed to offer an explanation for why he

set the fire violated his fifth amendment right against self-incrimination, (3) whether the evidence presented by the defendant in mitigation is sufficient to preclude the imposition of the death penalty, (4) whether the defendant was denied effective assistance of counsel when defense counsel failed to investigate and present sufficient mitigation evidence, and (5) whether the Illinois death penalty statute is unconstitutional because it places the burden on the defendant to prove sufficient mitigating factors to preclude imposition of the death penalty. We believe that the defendant's claim of ineffective assistance of counsel stands out among the issues raised.

### A. *Ineffective Assistance of Counsel*

The defendant argues that his death sentence should be vacated or in the alternative that he is entitled to a new sentencing hearing because his trial counsel was ineffective for failing to investigate and present sufficient mitigation evidence that "[m]ight have provided the court with a portrait of the defendant that may have influenced the choice of sentence." *People v. Orange*, 168 Ill. 2d 138, 171 (1995). The defendant argues that his sentencing hearing was essentially a farce. He maintains that defense counsel treated his hearing as a "mere postscript to the trial." *Kubat v. Thieret*, 867 F.2d 351, 369 (7th Cir. 1989). He notes that even the sentencing court made express statements recounting defense counsel's failures to provide information.

In support of his contention, the defendant highlights the affidavits of Charles Ruch, Leonard Martin and Douglas Graves, which were presented at his posttrial/sentencing hearing. He argues that his counsel ignored the known availability of Ruch, and never took the time to discover the additional mitigation evidence available from Leonard Martin and Douglas Graves. All witnesses would have testified with specificity regarding

the defendant's extensive civic contributions. In particular, Ruch would have been able to testify to the significant time that the defendant devoted to working for the betterment of the community.

As previously noted, the defendant must fulfill both prongs of the *Strickland* test in order to succeed on a claim for ineffective assistance of counsel. The defendant must show that counsel's performance fell below minimal professional standards and that but for counsel's incompetence there is a reasonable probability that the resulting sentence would have been different. See *Orange*, 168 Ill. 2d at 171; *People v. Perez*, 148 Ill. 2d 168, 186 (1992); *People v. Franklin*, 135 Ill. 2d 78, 116-17 (1990).

With respect to the first prong of the *Strickland* test, the defendant must overcome the presumption that counsel's challenged action might be considered sound trial strategy. *Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065. Ineffectiveness claims must be judged on the facts of the particular case at the time of counsel's conduct, and counsel's actions must be evaluated in light of all circumstances. *Strickland*, 466 U.S. at 690, 80 L. Ed. 2d at 695, 104 S. Ct. at 2066.

Counsel has a duty to investigate potential sources of mitigating evidence or must have a reason for not making such an investigation. *Orange*, 168 Ill. 2d at 170. The failure to offer mitigation evidence does not in and of itself establish deficient performance. *Perez*, 148 Ill. 2d 168. Defense counsel's decision not to present mitigating evidence will not be deemed incompetent if it stems from a theory of defense which does not require its use. *People v. Caballero*, 126 Ill. 2d 248, 275 (1989); *Strickland*, 466 U.S. at 699, 80 L. Ed. 2d at 700-01, 104 S. Ct. at 2070 (reliance upon extreme emotional distress as mitigation).

Courts are highly deferential in reviewing trial

counsel's strategic decisions regarding the presentation of mitigation evidence. *Orange*, 168 Ill. 2d at 170. However, such deference is not warranted where the lack of mitigation presented stems not from strategy, but from counsel's failure to properly investigate and prepare the defense. *Orange*, 168 Ill. 2d at 170. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691, 80 L. Ed. 2d at 695, 104 S. Ct. at 2066.

In order to fully analyze the defendant's claim, we examine the evidence presented by the State and the defendant at the sentencing phase, and likewise consider the trial court's comments at the close of evidence. The State's case in aggravation consisted of the defendant's birth certificate and its request that the court take judicial notice of the trial evidence.

The defendant's case in mitigation consisted of the brief testimony of three character witnesses, Arthur B. Kennedy, Camora Pitts and Sylvester Selvey. The collective testimony of these witnesses, including cross-examinations, constitutes 13 pages of trial transcript. These witnesses testified that the defendant cared for and loved his children. They all essentially testified that they thought the defendant did not commit the crime or that he did not deserve the death penalty. However, all were unfamiliar with the evidence presented at trial. Finally, the defendant testified that he is an elected official in Kankakee County and has no prior criminal background. Before the defense rested, the court stated to defense counsel:

"THE COURT: I got an awful lot of questions but nobody appears to be addressing them today. ***

Will there be anything further from the defense? I'm sitting here on a hearing in aggravation and mitigation and all I've heard is the testimony of three people who basically haven't heard the testimony of the case. All they've

told me is they don't believe he was guilty in the first place. You know, I'm wondering why we had to take a five day continuance to prepare for this hearing if this is all I'm receiving. Do you have more?

The ball is in your court, Mr. Washington. You going to call any more witnesses, or what are you going to do?

MR. WASHINGTON: We have no additional witnesses your Honor.

THE COURT: You resting?

MR. WASHINGTON: We rest."

The record shows that at that point, Washington received a message and informed the court that he might call one final witness. The court granted Washington's request for a recess. However, when the proceedings resumed, Washington did not present any further evidence and informed the court that he wished to proceed to argument.

During his mitigation argument, Washington referenced the defendant's battle with alcohol, his extreme emotional disturbance, his reputation, his concern for the community and his past behavior as a loving father. However, the balance of Washington's argument in mitigation was directed at re-arguing the evidence which allegedly shows that the defendant is innocent of the crimes charged, contrary to the trial court's express findings. Washington adhered to his failed trial theory that defendant's return to the fire and attempt to enter the house demonstrated his lack of guilt and "a complete absence of motive." Washington concluded his argument by begging the court's mercy for his innocent client and by stating that he would like the opportunity to present a motion for a new trial at a later date.

During the evidentiary hearing on the defendant's post-trial/sentencing motions, Washington testified that he probably did not "exert the same vigor at the hearing" that he did at the trial, and that he was demoralized and distraught when the defendant was found guilty. He admitted that he believed that there was

nothing he could say to the judge to prevent the imposition of the death penalty. Washington also admitted that a gentleman had contacted him about his willingness to testify, but Washington never followed up on the witness.

The affidavit of Charles Ruch indicates that he is an attorney who served on the county board of Kankakee County with the defendant. Ruch states that the defendant spent a significant amount of time working with the State's Attorney and other county officials to improve an ordinance designed to guarantee equal opportunities for businesses contracting with Kankakee County. Ruch's affidavit provides detailed descriptions of the defendant's civic contributions. Ruch also had the opportunity to observe the defendant interact with his children in a positive manner because they went on the children's school field trips together. Finally, Ruch's affidavit states that he informed Washington of his willingness to testify, but Washington never communicated with him again.

The affidavits of Leonard Martin and Douglas Graves indicate that both individuals served as members of the county board with the defendant and were familiar with his civic contributions. The affidavits show that they would have testified that the defendant spent significant amounts of time working for the betterment of the community by promoting and developing various community projects. Both Martin and Graves also indicated that they were never contacted by Earl Washington.

The State maintains that the record shows that Washington did not abdicate his duty to the defendant and presented mitigation evidence as well as a coherent argument in opposition to the death penalty. The State further maintains that Washington presented the mitigation evidence after considerable time and investiga-

tion, and this court should not question his strategic decisions.

The record belies the State's contentions. We agree with the defendant that the sentencing proceedings were a mere post-script to the trial. Washington's decisions at this phase of the trial did not stem from a coherent trial strategy, but rather an unreasonable feeling of hopelessness followed by a weak attempt to investigate mitigation evidence and present witnesses.

The testimony of the three witnesses who testified on the defendant's behalf did not add anything significant to the mitigation evidence. Their testimony was brief and uninformed. At the sentencing stage of the proceedings, the record contained only meager, nonspecific evidence of the defendant's involvement in his community. Defense counsel failed to develop evidence of the defendant's character by reference to his significant civic contributions.

At the close of evidence, after being made aware of the court's unfulfilled expectations for mitigation evidence and the opportunity to rectify the situation, Washington did nothing. He did so knowing that Charles Ruch was willing to testify and without uncovering mitigation evidence available from Martin and Graves. Ruch's testimony would have provided the court with a detailed account of the defendant's civic contributions as well as an indication of significant time that the defendant devoted to the betterment of the community. Arguably, the testimony of Martin and Graves would have given support and credibility to Ruch's testimony.

Additionally, at the post-trial hearing, Washington testified that he essentially believed that the sentencing phase of the case was hopeless. Washington's testimony suggests that based on this belief, he made only a tepid attempt to present mitigation evidence. This conclusion is well supported in the record. Consequently, we

conclude that Washington's decision not to further investigate or to present mitigation evidence cannot reasonably be characterized as a decision stemming from trial strategy. We determine that Washington's representation of the defendant at the sentencing phase of his trial fell outside of the wide range of professional competence and was not a matter of trial strategy.

Our conclusion is buttressed by the circuit court's numerous references to defense counsel's failures. In rendering its sentencing decision the court stated,

"[E]ver since you were found guilty I've been hoping, praying, that there would be some evidence in mitigation that would allow the Court not to impose the death penalty. And I was just totally amazed yesterday when the mitigation part of this hearing ended with three people coming in, making very short statements that they figured you were innocent, although they never heard the evidence, and you shouldn't be sentenced to death. One of them indicated that you loved your children and you loved the two children who're still living, as far as I know. That's all I heard.

\* \* \*

I went back home yesterday afternoon early, took all my notes with me \*\*\* trying to look for something. I was trying to find mitigation that wasn't shown to me by your counsel for your defense.

\* \* \*

You know, there's some comments made about your civic work. Nobody's told me what it's been yet. One or two witnesses who were supposed to be testifying as to your character and reputation for being peaceful and law-abiding mentioned that they worked on certain projects with you, and one said that you were anti-gang. But nobody, absolutely nobody, ever told me what you people did. For all I know, your total involvement might have been a 15 minute thing over coffee, or it might have been hundreds of hours. But nobody has told me that. That would come from your side of the case. I don't know what you did.

\* \* \*

As I said, the things cited in mitigation, with the exception of one or two things, is basically no mitigation at all because I don't know what it's all about. Defense counsel wouldn't even tell me what it was. The only real factors in mitigation that I got was that apparently you have no prior record.

\* \* \*

I have three full, legal size notebooks of notes here that I went over trying to find a mitigating factor, because nobody sitting at that table gave it to me. I understand why. There aren't any. None that I know of. The law is clear that if a jury hearing the case, that if the jury determines that there are no mitigating factors, the law says that the court shall sentence the defendant to death. I don't see how I can do otherwise if I don't find any.

If there is a nice thing about this—and I really don't think there is—any sentence will be stayed until it's gone through the entire appeal process, which can be years and years. I would invite the Supreme Court of this state, the United States, either one, they feel that I'm wrong, to reverse this case. If they feel you're not guilty, turn you loose. I don't think they're going to do that. If they feel you shouldn't get the death penalty, wonderful, because I don't want to give you the death penalty.

\* \* \*

Having found no mitigating factors, nobody having given me anything to consider, basically, in the way of mitigation even though I think I almost begged for it yesterday, I have no choice than to impose the death sentence \*\*\*."

To satisfy the prejudice prong of the *Strickland* test, the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. The reviewing court must balance the aggravating and mitigating circumstances, to determine whether there is a reasonable probability that but for

counsel's ineffectiveness the court would not have imposed the death sentence. See *People v. Coleman*, 168 Ill. 2d 509, 535-36 (1995); *Strickland*, 466 U.S. at 695, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068-69.

We believe that the testimony of Ruch, Martin and Graves, when viewed with the defendant's lack of criminal history, his emotional distress, and his excessive drinking, may have altered the trial court's determination that there was no evidence in mitigation sufficient to preclude the imposition of the death sentence. The ultimate focus of an ineffective-assistance-of-counsel claim must be on the fundamental fairness of the proceedings challenged. *Strickland*, 466 U.S. at 696, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069. The court should remain concerned with the question of whether the result of the particular proceedings is unreliable because of a breakdown in the adversarial process. *Strickland*, 466 U.S. at 696, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069. We conclude that such a breakdown occurred in this case and that the defendant is entitled to a new sentencing hearing. The defendant's death sentence is vacated and the cause remanded for a new sentencing hearing.

The defendant raises four additional challenges to his capital sentencing hearing and to the constitutionality of the Illinois death penalty statute. Because we have concluded that the defendant is entitled to a new sentencing hearing, we address only those issues which are likely to arise again on remand. See *People v. Mulero*, 176 Ill. 2d 444, 467 (1997); *People v. Simms*, 143 Ill. 2d 154, 173 (1991).

## B. *Eligibility*

The defendant contends that none of the trial court's eligibility findings are supported by the record. He maintains that he is not eligible for the death penalty under sections 9—1(b)(3) (multiple murders) and 9—1(b)(6) (felony murder) because the State failed to

prove beyond a reasonable doubt that he acted with knowledge of a strong probability of death or great bodily harm. See 720 ILCS 5/9—1(b)(3), (b)(6) (West 1992). The defendant essentially repeats the arguments addressed in section I(C) of this opinion. We adhere to our conclusion that the State proved beyond a reasonable doubt that the defendant committed knowing murder. We further determine that the trial court properly found the defendant eligible for the death penalty under sections 9—1(b)(3) and 9—1(b)(6) and reject the defendant's arguments to the contrary.

The defendant also argues that he is not eligible for the death penalty under sections 9—1(b)(7) (murder of a child under 12 years of age resulting from "exceptionally brutal or heinous behavior") and 9—1(b)(11) (cold, calculated and premeditated). See 720 ILCS 5/9—1(b)(7), (b)(11) (West 1992). He maintains that these sections are unconstitutionally vague or, alternatively, that they are not supported by the record. Thus, the defendant argues that he is not eligible for the death penalty.

The trial court based its finding of eligibility on four factors, two of which have been proved beyond a reasonable doubt by the State. See 720 ILCS 9—1(b)(3), (b)(6) (West 1992). We have previously held that "[t]he Illinois death penalty statute does not place special emphasis on any one aggravating factor and does not accord any special significance to multiple aggravating factors as opposed to a single aggravating factor." *People v. Page*, 156 Ill. 2d 258, 268-69 (1993). Thus, the defendant remains eligible for the death penalty, even if section 9—1(b)(7) or 9—1(b)(11) is found to be inapplicable in this case. See *People v. Cole*, 172 Ill. 2d 85, 102-03 (1996). Therefore, because we have found that the defendant is eligible for the death penalty under sections 9—1(b)(3) and 9—1(b)(6), we decline to address the issue of eligibility any further.

### C. *Constitutionality*

As a final matter, the defendant challenges the constitutionality of the Illinois death penalty statute. 720 ILCS 5/9—1 (West 1992). The defendant claims that the statute is unconstitutional because it impermissibly erects a greater barrier to the full consideration of mitigation than other statutes upheld by the United States Supreme Court. See *Walton v. Arizona*, 497 U.S. 639, 111 L. Ed. 2d 511, 110 S. Ct. 3047 (1990). The defendant contends that requiring him to make his death sentence legally impossible violates the principles of *Lockett v. Ohio*, 438 U.S. 586, 57 L. Ed. 2d 973, 98 S. Ct. 2954 (1978), as well as the eighth amendment's cruel and unusual punishment clause. U.S. Const., amends. VIII, XIV.

This court has previously rejected constitutional challenges to the Illinois death penalty statute which essentially mirror the arguments raised by the defendant. See *People v. Munson*, 171 Ill. 2d 158, 203-05 (1996); *People v. Simpson*, 172 Ill. 2d 117, 152 (1996); see also *People v. Gilliam*, 172 Ill. 2d 484, 522 (1996); *People v. Oaks*, 169 Ill. 2d 409, 470 (1996). We decline to reconsider the issue because the defendant has given us no persuasive reason to depart from our prior decisions upholding the constitutionality of the Illinois death penalty statute. See also *Mulero*, 176 Ill. 2d at 481.

### CONCLUSION

For the reasons set forth above, the defendant's convictions are affirmed. The defendant's death sentence is vacated and this cause is remanded to the circuit court of Kankakee County for a new sentencing hearing.

*Convictions affirmed;*
*death sentence vacated;*
*cause remanded.*