**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2019 IL App (3d) 180244-U

Order filed December 17, 2019

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2019

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-18-0244 Circuit No. 14-CF-742 |
| | ) | |
| CHARLES D. CHEFFER, | ) ) | Honorable Daniel L. Kennedy, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE WRIGHT delivered the judgment of the court.
Justices Carter and McDade concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:  Viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of both criminal sexual assault and aggravated criminal sexual abuse proven beyond a reasonable doubt.

¶ 2    The State charged defendant, Charles D. Cheffer, with two counts of criminal sexual assault and two counts of aggravated criminal sexual abuse, stemming from two separate incidents. Following a bench trial, the trial court found defendant guilty of the charges related to the first incident and not guilty of the charges as they pertained to the second incident. Defendant

appeals his convictions and argues the State failed to present sufficient evidence to sustain the convictions beyond a reasonable doubt.

¶ 3                                              I. BACKGROUND

¶ 4         On May 8, 2014, the State charged defendant by way of indictment with two counts of criminal sexual assault (720 ILCS 5/11-1.20(a)(4) (West 2014)) and two counts of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(d) (West 2014)).

¶ 5         Count I alleged that on or about February 26, 2014, defendant committed the offense of criminal sexual assault "in that said defendant, who was 17 years of age or older, committed an act of sexual penetration with Pat Doe, in that said defendant knowingly placed his finger into the vagina of Pat Doe and Pat Doe was at least 13 years of age but under 18 years of age, and the defendant held a position of trust, authority or supervision in relation to Pat Doe[.]"

¶ 6         Count II alleged that on or between January 1, 2014, and January 31, 2014, defendant committed the offense of criminal sexual assault "in that said defendant, who was 17 years of age or older, committed an act of sexual penetration with Pat Doe, in that said defendant knowingly placed his finger into the vagina of Pat Doe and Pat Doe was at least 13 years of age but under 18 years of age, and the defendant held a position of trust, authority or supervision in relation to Pat Doe[.]"

¶ 7         Count III alleged that on or about February 26, 2014, defendant committed the offense of aggravated criminal sexual abuse "in that said defendant committed an act of sexual penetration with Pat Doe, who was at least 13 years of age but under 17 years of age when the act was committed, in that said defendant knowingly placed his finger into the vagina of Pat Doe, and the defendant was at least 5 years older than Pat Doe[.]"

2

¶ 8          Count IV alleged that on or between January 1, 2014, and January 31, 2014, defendant committed the offense of aggravated criminal sexual abuse "in that said defendant committed an act of sexual penetration with Pat Doe, who was at least 13 years of age but under 17 years of age when the act was committed, in that said defendant knowingly placed his finger into the vagina of Pat Doe, and the defendant was at least 5 years older than Pat Doe[.]"[1]

¶ 9          Defendant's bench trial commenced on November 22, 2016. The State called Alyxandria Pristas as the first witness. According to the record, Pristas began screaming and did not testify that day. The State explained to the court that Pristas suffered from anxiety. Thus, the State called Pristas as the first witness to testify without family members in the courtroom. Later in the trial, Pristas was able to testify in open court.

¶ 10          G.G., born November 3, 2000, testified that she had known defendant her entire life and that they were friends. Defendant was also friends with G.G.'s mother and began babysitting G.G. once or twice a month when G.G. was 13 years of age. Every once in a while, defendant would babysit G.G. overnight. In February or March 2014, G.G. told her mother that defendant sexually assaulted her.

¶ 11          G.G. explained that in January 2014, she and her younger brother spent the night at defendant's grandfather's home because G.G.'s mother was out of town for work (the first incident). G.G. stayed at the home from approximately 6 p.m. until 8 a.m. Defendant, defendant's girlfriend at the time, Pristas, and defendant's grandfather were present in the home. However, Pristas left sometime between 11 p.m. and 1 a.m. G.G. stayed in defendant's room and

_____

[1]In response to a motion for a bill of particulars filed by defendant, the State alleged that the crimes charged in counts I and III occurred between February 25, 2014, and February 27, 2014. The State alleged that the crimes charged in counts II and IV occurred between January 27, 2014, and January 29, 2014.

gave a general description of the residence. G.G. explained that defendant's bedroom lacked a mattress, so defendant laid several blankets on the floor to sleep.

¶ 12　　　　The group, which included G.G., her brother, Pristas, and defendant, played video games and watched television in defendant's room. G.G. shared a chair with defendant and stated that the two were "squishing" next to one another. Pristas was sitting on the floor on her phone. G.G., Pristas, and defendant laid down on the blankets to go to sleep. Defendant eventually "cuddled up" to G.G. According to G. G., "cuddled up" meant defendant put his arm around G.G. and positioned his head next to G.G.'s shoulder. At this point, Pristas became upset. G.G. stated that she was unsure why Pristas became upset. Pristas stood up, mumbled something to defendant, and went into the next room. Defendant followed Pristas to speak with her. G.G. and her brother went into the room to check on them. G.G. observed Pristas crying and observed defendant bite Pristas on the cheek.

¶ 13　　　　Eventually, G.G, defendant, and Pristas laid down in the same spot on the blankets. However, Pristas stood up and asked defendant to take her home. G.G. believed defendant took Pristas home. G.G. stated that there was no physical contact with defendant before Pristas left the home. Defendant returned a half hour to an hour later. Defendant laid on the floor next to G.G. and said "I'm horny[,]" and "do you care if I play with myself?" G.G.'s brother was sleeping on some chairs in the room. G.G. could see defendant out of the corner of her eye masturbating with his pants halfway down. G.G. ignored defendant until he began to touch her. Defendant unbuttoned G.G.'s pajama pants and put his hand underneath G.G.'s underwear. Defendant put his finger in and out of G.G.'s vagina "once or twice[.]" Defendant was masturbating with one hand and touching G.G. with the other. In order to get away from defendant, G.G. told defendant

4

she had to go to the bathroom. G.G. sat in the bathroom for two or three minutes until she thought it was okay to come out.

¶ 14        G.G. returned to the bedroom and saw that defendant was still masturbating. According to G. G., defendant ejaculated into the sheets before she fell asleep on the same make-shift bed. When G.G. woke up, her pajama pants were off and on the opposite side of the room. G.G. went to the bathroom to take a shower. Defendant walked in and opened the shower curtain. Defendant asked G.G. if she liked him. Defendant told G.G. not to tell anyone because they could both get into trouble.

¶ 15        Next, G.G. testified about a second time (the second incident) that G.G. and her brother spent the night with defendant at another location. G.G. testified defendant also sexually assaulted her on that occasion. G.G. told her mother about the assaults approximately one week after the second incident. G.G. did not tell her mother earlier because she was afraid of what would happen. The trial court found defendant not guilty with respect to the two counts related to the second incident. Accordingly, we will not discuss those facts in detail.

¶ 16        Defendant's trial resumed on December 21, 2016. During cross-examination, G.G. testified that she had been diagnosed as bipolar and currently took several medications, including mood stabilizers, to combat the condition. G.G. testified that defendant lived with her and her mother for a time and that she was saddened when defendant moved out. Other than the two incidents in question, G.G. never felt uncomfortable around defendant. G.G. stated that she and defendant would sometimes wrestle. G.G. thought of defendant as a father figure. With regard to the incident in January 2014, G.G. testified that she was not positive of the exact date of the incident, only that the incident occurred in the beginning of the year.

¶ 17 The defense cross-examined G.G. on prior inconsistent statements concerning the dates of the two incidents. G.G. was also cross-examined on discrepancies in her prior and current version of the same events. When confronted with prior testimony from a September 2015 order of protection hearing (September 2015 hearing), G.G. acknowledged that she stated she did not think she had any contact with defendant in the beginning of 2014. G.G. stated at the September 2015 hearing that she thought the last time she had contact with defendant was when she was 13 years of age in the spring or the fall, but she wasn't sure which. G.G. acknowledged that she stated during the September 2015 hearing that the first incident occurred sometime in 2013, not 2014. G.G. also acknowledged that during the September 2015 hearing, she testified that the incident occurred four months before her 14th birthday.

¶ 18 With regard to the first incident, G.G. testified on cross-examination that after defendant told her he was horny, she turned over on her back toward defendant. G.G. was not held down and did not alert her brother. G.G. was scared to say something. G.G. could have gone to the bathroom but did not. The only light in the room was from a computer monitor. G.G. watched out of the corner of her eye as defendant masturbated but "she wasn't trying to [watch]." G.G. admitted during the September 2015 hearing that she stated that defendant began masturbating after he touched G.G., and that defendant pulled G.G. on top of him, and G.G. pulled herself back down.

¶ 19 On cross-examination, G.G. admitted that during the September 2015 hearing she stated that she shouted to her mother about the incidents. This disclosure took place when G.G. was quarrelling with her sister. G.G. testified that defendant bragged about the incidents.

¶ 20 After G.G.'s testimony, the State called Pristas to testify. Pristas explained that she had a panic attack when she first took the stand at the beginning of the bench trial. Pristas explained

6

that she suffered from an anxiety disorder, was bipolar, and had post-traumatic stress disorder (PTSD). Pristas stated that neither her illnesses nor her prescribed medications made it difficult for her to distinguish fantasy from reality.

¶ 21 Pristas knew G.G. and G.G.'s mother. Pristas testified that from October 2013 until March 2014 she had a romantic relationship with defendant. Pristas met G.G. when she and defendant moved in with G.G. and G.G.'s mother. In the first week or two of January 2014, Pristas recalled G.G. and her brother staying the night in defendant's bedroom at defendant's grandfather's home. Pristas, G.G., and defendant were going to sleep on the floor, and G.G.'s brother was going to sleep in a chair.

¶ 22 That night, around 9 p.m. to 10:30 p.m., Pristas took a photograph of G.G. and defendant. The photograph depicted defendant on his back, G.G. straddling defendant with her arms around defendant's torso, and a black sheet or comforter that was used as part of the makeshift bed on the floor. Pristas also identified another photograph that depicted defendant and G.G. roughhousing or wrestling.

¶ 23 After the photo was taken, defendant and G.G. continued to interact. Pristas stated that "[defendant] found out that [G.G.] was uncomfortable about not having her mom there, or that is the story I was told, and he pulled her into his lap bridle style and caressed her thighs and arms." Pristas explained that G.G. was sitting sideways on defendant's lap with her side against defendant's chest. Pristas stated that defendant was running his hand up and down G.G.'s thigh, once all the way up to her hip. At this time, G.G. had her arms wrapped around defendant's neck and was cuddling his chest. Pristas remembered stating that she was unhappy with the situation and left for the other room. G.G. and her brother came to comfort Pristas in the other room.

7

Defendant came into the room and bit Pristas's cheek. Pristas thought defendant was bending down to give her a kiss on the cheek, but he bit her instead, and she shrieked.

¶ 24    Pristas, G.G., and defendant went back into defendant's bedroom and laid down on the makeshift bed. Pristas laid about a foot away from defendant and G.G. Pristas testified that G.G. was laying on top of defendant with one leg over one of his legs, one arm around his chest, and her head on his chest. Defendant and G.G. were in this position for no more than two minutes before Pristas had a problem and became very agitated. A short time later, defendant walked Pristas downstairs, and her father picked her up from the home.

¶ 25    Pristas returned the next morning around 8 a.m. or 9 a.m. G.G. and her brother were still at the home. Defendant told Pristas that morning he had pulled the shower curtain open and viewed G.G. naked. In March 2014, defendant told Pristas that he made G.G. sleep in the bed with him because there was no other place for her to sleep. Pristas's relationship with defendant ended in mid-to-late March 2014, the same time Pristas heard about the allegations against defendant.

¶ 26    On cross-examination, Pristas stated that her initial outburst at the beginning of the trial came as a result of her fear of people and places, even though there was not a real threat from those people and places. Pristas testified that play wrestling between children and adults is not abnormal and that it was not unusual that G.G. and defendant wrestled. Pristas took the pictures in question because everyone was having fun and she wanted to memorialize the night. Pristas described the way defendant touched G.G. while she sat on his lap as distasteful and unsavory. Pristas did not speak with anyone about defendant's actions until she told G.G.'s mother the next morning. Pristas was scared to tell anyone and remarked that defendant physically threatened her

that evening by biting her cheek. Pristas testified that G.G. initially told her defendant viewed her naked in the shower, and that defendant tried to hide this information from Pristas.

¶ 27    Defendant's bench trial resumed again on March 3, 2017. Thereafter, the State called G.G.'s mother, Margie Gibson, to testify. Gibson testified that defendant and Pristas babysat G.G. and her son from January 25 to January 27, 2014, and from February 25 to February 27, 2014, while she was working 48-hour shifts as a nurse. In March 2014, G.G. told Gibson about defendant's conduct. Gibson stated that G.G. was crying, shaking, and looked ashamed. Approximately one week later, Gibson saw defendant in Walmart, where he asked to see G.G. Following the encounter, Gibson contacted law enforcement.

¶ 28    On cross-examination, Gibson testified that G.G. looked to defendant as a father figure. Defendant would give Gibson's children advice and was structured and stable. Defendant lived with Gibson's family on three or four different occasions throughout the years. Gibson testified that the conversation with G.G. took place two to three weeks after the second incident in February 2014. Gibson admitted to testifying during the September 2015 hearing that G.G. first spoke with her two weeks after the first incident, in the end of February, beginning of March. Gibson also stated that the first time G.G. spoke to her about the incidents was the same day Gibson saw defendant at Walmart.

¶ 29    Gibson testified that G.G. had been diagnosed as bipolar. However, Gibson explained that G.G. was recently diagnosed with PTSD and ADHD with severe anxiety, which were associated with "the traumatic event" and overturned G.G.'s prior diagnosis as bipolar. G.G. had been hospitalized when she was eight or nine years of age due to mental health issues.

¶ 30    Next, the prosecutor explained that G.G.'s younger brother was a witness, but his memory was exhausted. At the time of trial, G.G.'s brother could no longer recall many of the

events in question. Although the court ruled to allow the brother's prior recorded statements from April 2014 into evidence, the State elected, in conjunction with the family, not to call him as a witness. The prior recorded statements were not introduced as evidence to the court.[2]

¶ 31　　　　On October 3, 2017, defendant, then 32 years of age, testified. Defendant denied babysitting the children in January 2014 and instead claimed he babysat the children overnight at his grandfather's home in November 2013. Defendant stated that Pristas was present that night. Defendant denied having sexual contact with G.G., masturbating in front of G.G., and telling G.G. he was horny. Defendant explained that in November 2013 he inadvertently saw G.G. in the shower at his grandfather's home. Defendant was bringing G.G. a towel and tried to close the curtain because the floor was getting wet when he viewed G.G. Defendant testified that he, Pristas, and the children were in his bedroom watching television that night when:

> "[Pristas] just blew up and started screaming and was going crazy and I had stepped out with her and decided it was best that she just went home for the night. I went down stairs with her and waited until her father picked her up and then I went back upstairs with the kids."

Defendant denied babysitting the children from February 25 through February 27, 2014. Defendant stated that he babysat the children in March 2014 at another location. Defendant denied having sexual contact with G.G. on that date.

¶ 32　　　　Before these events took place, defendant explained that he rented a room from Gibson beginning in October 2013. Defendant agreed to pay Gibson $1000 to stay with Gibson for seven months, but left after a month and a half to live with his grandfather. Defendant paid the $1000 up front. Defendant requested a refund from Gibson. Gibson told defendant that she would

---

[2]The record reveals that G.G.'s brother was 12 years of age at the time of the recording.

refund him a prorated amount but would need to take out a title loan to do so. Defendant never received the funds. Defendant acknowledged that he saw Gibson at Walmart in March 2014, but only said "hi" to her.

¶ 33    On cross-examination, defendant testified that a disagreement arose between Gibson and defendant regarding the money Gibson promised to pay defendant. Defendant continued to babysit the children on the weekends even after the dispute arose.

¶ 34    On the night of the first incident, G.G.'s brother slept in the chaise lounge. Defendant made a makeshift bed by spreading several blankets on the floor. G.G. slept in the makeshift bed and faced the wall in the fetal position while defendant slept by the door. Defendant slept on his back approximately two and a half to three feet away from G.G. Defendant wore pajama pants while G.G. wore pajama pants and a t-shirt. Defendant testified that either of the children could have slept in the guest room next door, but the children chose to sleep in defendant's room. The children needed to stay upstairs, however, because defendant's grandparents did not want to be disturbed.

¶ 35    Defendant denied cuddling G.G. and claimed Pristas became upset that night because of a rape scene on television. Defendant followed Pristas out of the room, but neither of the children came with them. Defendant admitted he frequently wrestled with G.G. and her brother. For this reason, defendant could not be certain the photograph depicted events from the evening Pristas left defendant alone with the children. Defendant recalled telling Pristas about the shower incident. Defendant denied biting Pristas on the cheek and asking G.G. if she liked him.

¶ 36    On re-direct examination, defendant stated that it was possible he could have brushed against G.G. when they were wrestling, but she didn't say anything about it. The defense rested.

¶ 37        As rebuttal evidence, the court allowed the State to introduce defendant's prior burglary conviction for impeachment purposes, but the court stated that it would give the conviction little weight. The court found defendant guilty of counts II and IV, related to the first incident, and not guilty of counts I and III, related to the second incident. The trial court sentenced defendant to six years in the Illinois Department of Corrections. Defendant appeals.

¶ 38                                       II. ANALYSIS

¶ 39        On appeal, defendant argues the evidence presented by the State was insufficient to prove defendant guilty beyond a reasonable doubt of criminal sexual assault and aggravated criminal sexual abuse as alleged in counts II and IV of the indictment. The State asserts the evidence presented at defendant's bench trial was more than sufficient to support a guilty finding beyond a reasonable doubt.

¶ 40        When reviewing a challenge to the sufficiency of the evidence, this court considers, after viewing the evidence in the light most favorable to the State, whether any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). Defendant contends the State's evidence was insufficient in several respects. We address each contention separately below.

¶ 41        Defendant argues that the absence of forensic evidence to corroborate G.G.'s accusations of sexual contact created a reasonable doubt regarding his guilt. Medical or physical evidence of an assault is extremely compelling evidence but such evidence is not required to sustain a conviction. See *People v. Patterson*, 90 Ill. App. 3d 775, 781 (1980); See generally *People v. Effinger*, 2016 IL App (3d) 140203, ¶ 20. The testimony of the victim alone is sufficient to support a conviction. See *Patterson*, 90 Ill. App. 3d at 781. In this case, the length of the passage of time before the investigation may have contributed to the absence of retrievable forensic

evidence. However, the absence of such evidence does not require a reversal of defendant's conviction standing alone. See *Id*.

¶ 42     Next, defendant argues his conviction should be set aside because the trial court seemed to ignore that G.G. was mentally unstable, and her testimony was contradicted by both Pristas and Gibson. In addition, defendant submits Pristas's mental health issues and unusual behavior in the courtroom rendered her testimony unworthy of belief and further weakened the persuasiveness of the State's evidence.

¶ 43     It is well established that "[t]he mental health history of a witness is relevant as it relates to credibility, and is thus a permissible area of impeachment[.]" *People v. Flowers*, 371 Ill. App. 3d 326, 330 (2007). In this case, defense counsel skillfully cross-examined the State's witnesses and thoroughly explored the mental health issues of both G.G. and Pristas for the court's consideration. Moreover, Pristas fortified the existence of her mental health infirmity by demonstrating some unusual behavior that the court was able to witness firsthand. Nonetheless, the trial court, rather than this court, is best suited to determine whether the undisputed mental health issues of each witness eroded or destroyed their credibility. See *Collins*, 106 Ill. 2d at 262.

¶ 44     In addition to her mental fragility, defendant contends G.G.'s testimony about the date of the first incident demonstrates her inability to accurately recall events and testify truthfully. However, for purposes of this appeal, both parties agree that proving the date alleged is not an element of these offenses. *People v. Kelly*, 185 Ill. App. 3d 43, 51 (1989); *People v. Letcher*, 386 Ill. App. 3d 327, 331 (2008); *People v. Barlow*, 188 Ill. App. 3d 393, 402-04 (1989).

¶ 45     The record supports the defendant's argument that G.G.'s testimony about the precise date of the first incident was problematic. For example, Pristas testified that the incident in question occurred in the first week or two of January 2014. Similarly, Gibson testified that

defendant and Pristas babysat her children overnight from January 25 to January 27, 2014. During this trial, G.G.'s testimony was consistent with that of Pristas and Gibson concerning the occurrence taking place in January 2014. G.G.'s testimony at trial was directly contrary to her testimony at the September 2015 hearing. Specifically, G. G. testified during the September 2015 hearing that she did not think she had any contact with defendant in the beginning of 2014 and that the first incident occurred sometime in 2013 when G.G. was 13 years of age.

¶ 46    Ultimately, weaknesses in testimony, such as inconsistencies, contradictions, and the inability to recall *exact dates* affect the weight a trier of fact should assign to a witness's testimony but, standing alone, do not create reasonable doubt. *People v. Williams*, 223 Ill. App. 3d 692, 697 (1992); See *People v. Gray*, 2017 IL 120958, ¶ 47. Again, the defense persuasively argued the weaknesses of each witnesses' testimony before the trial court. However, the trial court did not adopt the defense's view that G.G.'s mental health issues or the variations in her testimony made G.G.'s testimony unbelievable as a whole.

¶ 47    Finally, defendant argues that the State's failure to call the only other occurrence witness, G.G.'s brother, and the State's failure to introduce his prior recorded statement as evidence, supports the inference that G.G.'s brother would *not* have corroborated G.G.'s accusations. Defendant correctly points out to this court that the State's failure to call G.G.'s brother as a material witness may support the fair inference that his testimony would not help establish defendant's guilt. *People v. Doll*, 371 Ill. App. 3d 1131, 1137 (2007).

¶ 48    However, during trial, the prosecutor explained to the court that G.G.'s younger brother could no longer recall many of the events in question. After consulting with the family, the prosecution informed the court that the State decided not to call the young witness to the witness

stand. It was within the province of the trial court to accept or reject this explanation for his absence at trial.

¶ 49　　It is well established that the trier of fact is responsible for resolving conflicts in the testimony, weighing the evidence, and drawing all reasonable inferences based on the evidence. *People v. Howery*, 178 Ill. 2d 1, 38 (1997) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Reviewing courts must not forget that the trier of fact was able to hear and observe the witnesses as they presented their testimony. See *People v. Smith*, 185 Ill. 2d 532, 541 (1999). For this reason, when evidence presented is capable of producing conflicting inferences, it is best left to the trier of fact for a proper resolution. *People v. Campbell*, 146 Ill. 2d 363, 380 (1992).

¶ 50　　In this case, the trial court was able to see and hear the testimony and demeanor of each witness. As pointed out by defendant in this appeal, the record documents: (1) the absence of forensic evidence; (2) the existence of both G.G. and Pristas's mental health issues; (3) the inconsistencies in G.G.'s testimony; and (4) the State's failure to call G.G.'s brother as an occurrence witness. Obviously, in spite of all of these factors, the trial court found G.G.'s unwavering testimony regarding the sexual contact during the first incident to be credible.

¶ 51　　After viewing the evidence in the light most favorable to the State, we conclude that a rational trier of fact could have found that the essential elements of the crimes alleged in counts II and IV were established beyond a reasonable doubt. We affirm defendant's convictions.

¶ 52　　　　　　　　　　　　　　　III. CONCLUSION

¶ 53　　The judgment of the circuit court of Will County is affirmed.

¶ 54　　Affirmed.