2020 IL App (1st) 182053-U

No. 1-18-2053

Order filed December 23, 2020

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 15 CR 20877 |
| | ) | |
| RODY RODRIGUEZ-OCAMPO, | ) | Honorable |
| | ) | Ramon Ocasio III, |
| Defendant-Appellant. | ) | Judge presiding. |

_____

JUSTICE BURKE delivered the judgment of the court.
Presiding Justice Howse and Justice Ellis concurred in the judgment.

**ORDER**

¶ 1     *Held*:   We affirm defendant's conviction for aggravated domestic battery where there was sufficient evidence to convict him of the offense, there was no affirmative evidence in the record showing the trial court considered improper evidence and he failed to establish his trial counsel was ineffective.

¶ 2     Following a bench trial, defendant Rody Rodriguez-Ocampo was found guilty of aggravated domestic battery and not guilty of home invasion. The trial court subsequently sentenced him to three years' imprisonment. On appeal, defendant contends that: (1) the State

failed to present sufficient evidence to prove his guilt; (2) the trial court erred when it considered photographs that were not offered into evidence, lacked a foundation and then mischaracterized what the photographs depicted; and (3) his trial counsel was ineffective. For the reasons that follow, we affirm.

¶ 3                                                    I. BACKGROUND

¶ 4     A grand jury indicted defendant with one count of home invasion and one count of aggravated domestic battery based on an alleged incident in November 2015. Defendant, through private counsel, filed an answer to discovery and asserted that he would raise self-defense at trial. Prior to trial, defendant filed a motion to introduce evidence of the violent character of the complainant, Natalia Flores Maldonado, under Illinois Rule of Evidence 405(b) (eff. Jan. 1, 2011) and *People v. Lynch*, 104 Ill. 2d 194 (1984). The first instance occurred in July 2015 when Natalia allegedly punched defendant in the lip, and the second occurred in October 2015 when she allegedly scraped his vehicle using a sharp object. The trial court granted defendant's motion to introduce these alleged acts, and the case proceeded to a bench trial.

¶ 5                                               A. The State's Case

¶ 6     In November 2015, 17-year-old Natalia Flores Maldonado and her mother, Maria Isabel Maldonado, lived with various family members at the house of Natalia's cousin, Syrley Orduna, in Cicero. Orduna had introduced Natalia to defendant approximately two years earlier and they had been dating ever since. However, according to Natalia, her relationship with the then 28-year-old defendant had been deteriorating because she believed defendant was cheating on her.

¶ 7     On the night of November 28, 2015, defendant and Natalia went to a party. There, defendant talked to multiple women, which led to him and Natalia having an argument. Defendant brought Natalia back to her residence and she went inside, but defendant did not. Natalia set an

alarm on her phone for the next morning and went to sleep. When she woke up the following day, she could not find her phone, so she used Maria's phone and called her own phone. Defendant answered it and started laughing. She told him to bring her phone back, which he did later in the day while Natalia was at her job. When defendant returned the phone, Natalia broke up with him. She had previously tried to break up with defendant other times, but he would ask for another chance and they ended up staying together. After her shift ended that day, she went back home and took a nap in her room, which was located in the basement of Orduna's house. She woke up around 7 or 8 p.m. and went to talk to her mother upstairs. When she returned downstairs, she observed defendant, who had appeared in her room unannounced and uninvited. He asked her for another chance, but she declined. Defendant then left Natalia's residence.

¶ 8    Between 11 p.m. and midnight, Natalia was looking at her phone when she noticed defendant looking at her through the basement window. Defendant asked Natalia to talk to him, but she declined. Defendant disappeared from the window, and suddenly, he re-appeared in the basement and began calling her names. Natalia told defendant to stop and to leave, but he stayed and continued calling her names. Defendant then snatched Natalia's phone from her hands so he could see if she was "talking to someone." As Natalia tried to walk out of her bedroom and go upstairs to her mother, defendant "pulled" her toward him by grasping her arm with his hands. Natalia began screaming for her mother, but defendant covered her mouth with his hands. When Natalia stopped yelling, defendant let her go, which caused her to again attempt to run upstairs to her mother. Defendant became "more aggressive" and pulled her again, causing Natalia to fall to the ground. Defendant continued to pull her, resulting in her pajama pants ripping. Afterward, defendant picked her up and "threw" her onto her bed. As Natalia was on her back, defendant was on top of her preventing her from getting up. Natalia again screamed. Defendant then flipped her

onto her stomach, covered her mouth with one of his hands and continued to press his body into hers so she would stop screaming. At this point, defendant began hitting her on the shoulder, but Natalia bit his hand. Defendant removed his hand from her mouth and flipped her back onto her back. Natalia once again screamed for help, at which point defendant began choking her by placing both of his hands on her neck and squeezing. Natalia could not breathe and thought defendant "was going to kill" her.

¶ 9    Meanwhile, Orduna's daughters heard "noises and screams" coming from the basement, so they alerted Maria, who was on the second floor of the house. Maria rushed down to the basement and observed defendant choking Natalia on the bed. When Maria appeared, defendant let go of Natalia, but she remained on the bed for a little bit gasping for air. Natalia then called the police.[1] Once officers from the Cicero Police Department arrived, they placed defendant under arrest. Natalia went to the police station, where an officer took photographs of her body that, according to Natalia, showed bruises, scratches and red marks on various parts of her body as well as her ripped pajama bottoms.[2] At trial, Natalia denied that she hit defendant that night or ever during their relationship.

¶ 10                          B. The Defense's Case

¶ 11    Defendant testified that, in 2013, he met Natalia and she told him that she was 17 years old. In July 2015, he picked Natalia up from work and she appeared intoxicated. Defendant drove her home, and as he was trying to get her into her house she was acting "crazy" and "wild."

---

[1] A recording of Natalia's call to the police was introduced at trial and entered into evidence. However, the recording was not included in the record on appeal.

[2] These photographs were also introduced at trial and entered into evidence. However, only the photograph of Natalia's ripped pajama bottoms was included in the record on appeal.

Suddenly, she hit him with a closed fist on the lip, which caused his lip to bleed profusely and left him with a scar. Defendant did not call the police or go to the hospital, but he did take a photograph of his lip, which he sent to Natalia's brother to show Maria. In October 2015, after Natalia had read messages on defendant's phone, she became jealous and began to "act[] crazy." Natalia then went to defendant's car, scratched it in various places and scratched the word "p***," Spanish for male whore. Defendant again did not call the police, but he explained at trial that he did so because he loved Natalia and did not want her to get into trouble.

¶ 12    On the night of November 28, 2015, he and Natalia went to a bar with some friends, and both drank alcohol. During the night, they had an argument because Natalia was jealous that defendant had also invited some of his female friends. Eventually, they left the bar and on the way back to Natalia's house, she was quiet and seemed mad. After defendant brought Natalia inside her house, he grabbed her cell phone to check her messages and ultimately gave the phone back to her the next day at her job. According to defendant, she never broke up with him, and they made plans to see each other later that night.

¶ 13    At around 9 p.m. on November 29, defendant went to Natalia's house and knocked on the basement window. She told him to come inside, and he did. Recently, Natalia allowed him to make a copy of her key, so that he could enter the house through the basement door. They talked about what happened at the bar the previous night and defendant ultimately told her that he wanted to break up. Natalia became mad and started kicking defendant, who told her to stop. When he tried to prevent her from continuing to kick him, her pajama pants ripped. Then, Natalia began slapping defendant with an open hand. In response, he grabbed her hands, hugged her and tried to calm her down. As he was trying to comfort her, Natalia bit defendant's finger and was still "crazy out of control." Defendant told Natalia that if she did not stop biting him, he was going to bite back,

which he eventually did on her left shoulder. Natalia continued to act volatile and slapped him again. Unsure of what to do, defendant put his hand on her neck in order to stop her attack and she began to settle down. Shortly after, Maria came down to the basement, and Natalia called the police. Defendant stayed at the house and waited for the police to arrive because he had not done anything to her. At trial, defendant denied that he ever hit Natalia, tried to cover her mouth or tried to choke her.

¶ 14     Syrley Orduna testified that there was some "tension" in the family concerning defendant and Natalia's relationship because he was 11 years older than her, and they were always having issues. Though Orduna observed them constantly fighting verbally, she never observed defendant act violently toward Natalia. At night on November 29, 2015, Orduna and her daughter heard noises coming from the basement, which sounded like arguing. Although it was Orduna's house, she did not feel comfortable confronting Natalia about it, so she told her daughter to tell Maria. A short time later, Maria yelled for Orduna, and Orduna came to the basement where she observed Natalia crying and calling the police while defendant was sitting on the bed. Defendant appeared scared, so Orduna asked him what happened. Defendant responded that he "wasn't trying to choke her" and that she was hitting him so he was "just trying to push her away." Orduna did not know that defendant had a key to her house until he told the police that Natalie had given him one.

¶ 15     The parties stipulated that, if Detective Soto of the Cicero Police Department had testified at trial, he would have stated that Natalia never told him that Maria had come downstairs while defendant was on top of her. Additionally, Detective Soto would have testified that Natalia never told him that defendant hit her shoulder or that she and defendant broke up on November 29.

¶ 16                    C. Photographs of the Scratches on the Car

¶ 17    During the State's cross-examination of defendant, it asked him whether he ever took photographs of the scratches on his car caused by Natalia and gave them to his defense attorneys. Defendant responded that he had. Subsequently, in a sidebar, the State asserted that it had not received those photographs, which it argued was required by Illinois Supreme Court Rule 413 (eff. July 1, 1982). Defense counsel stated that he and his co-counsel never tendered the photographs because they never intended to use them at trial, as required by Rule 413. The State, however, asserted that was irrelevant for purposes of Rule 413. The trial court asked defense counsel if he had the photographs in his possession and if so, to retrieve them. Counsel indicated he did and that he would. The State remarked that it had no interest in viewing the photographs, but requested that "any testimony regarding the victim carving words on the defendant's car be stricken" for the defense's failure to produce the photographs related to its pretrial *Lynch* motion. Defense counsel noted that none of the photographs showed what defendant testified to of the word "p***" being scratched onto his car. The court asked defense counsel if he had any objection to it reviewing the photographs, and counsel responded that he did not. The court proceeded to look at the photographs.

¶ 18    After reviewing them, the trial court stated that it "reviewed four what appear to be copies of colored photographs of a motor vehicle that does show what appear to be scratches. I can't make out any lettering." The State reiterated its request for sanctions for defense counsel's failure to tender the photographs and asserted that it presumed this failure was because the photographs directly contradicted defendant's testimony that Natalia had scratched the word "p***" onto his car. To this end, the State requested that defendant's testimony about Natalia's actions in October 2015 "be disregarded by this Court as outright false." The court informed the parties that it would

take the State's request under advisement and instructed the State to complete its cross-examination of defendant.

¶ 19    After defendant finished testifying and the defense indicated that it was resting, the trial court asked the State if it had any rebuttal evidence. The State responded that it depended on the court's resolution of its request for sanctions and reiterated its argument for sanctions based on a purported violation of Rule 413. Defense counsel repeated that Rule 413 only required the defense to tender photographs that it intended to use at trial, and it never intended to use the photographs. After defense counsel's argument, the trial court asked: "How should the Court view the fact that I actually have seen the four photos?" Defense counsel responded that he only gave the photographs to the court because of its request. The court then noted "Right. And at this point I have seen the photos. And, based on my review, none of them appear to say what the defendant said they said, which is p***." Defense counsel further noted that the photographs were consistent with the defense's pretrial *Lynch* motion that only alleged Natalia had scratched defendant's car and the inconsistency resulted only because defendant testified that she scratched the word "p***."

¶ 20    Thereafter, the State observed that defense counsel was in possession of photographs that showed what defendant testified to "did not occur" and if the State did something similar, the potential sanctions would be far more severe. The State modified its request and asked the court to not consider anything alleged in defendant's pretrial *Lynch* motion based on "the truth and veracity of both the defendant and counsels being in question," but at the very least strike defendant's testimony about Natalia scratching his car. Following the parties' arguments, the trial court denied the State's motion, finding that, under Rule 413, the defense only had to produce photographs it intended to use at trial and the defense in this case did not intend to use the four photographs of defendant's car. However, the court asserted that, once defense counsel knew

defendant "may perhaps" have testified untruthfully, counsel had an obligation to inform the court of this possibility.

¶ 21                                    D. Closing Arguments

¶ 22    In the State's closing argument, it asserted that defendant grabbed Natalia, held her, covered her mouth as she attempted to scream and eventually choked her. The State contended that defendant's version of events, in particular that Natalia instigated the fight by kicking him, was a "bold face lie" and contradicted by the evidence, including a photograph of Natalia's ripped pajama bottoms taken by the police. Meanwhile, the defense argued that Natalia was constantly jealous during her relationship with defendant, and oftentimes her jealously manifested itself in violent ways, including the instances in July and October of 2015. The defense asserted that, when defendant tried to break up with her on the night of November 29, 2015, she lost control and became violent toward him. The defense highlighted various instances where Natalia's testimony was inconsistent with what she told the Cicero police officers and posited that she lacked credibility because of the inconsistencies. Furthermore, the defense noted the photographs taken by the police and posited that they were not consistent with defendant choking Natalia, but rather with him fending her off. The defense concluded that, when Natalia began striking defendant first, he acted only to deescalate the situation and defend himself.

¶ 23    In rebuttal, the State observed that the defense attempted to portray defendant as mature and credible, but posited that a mature 28-year-old does not date a 17-year-old. In an attempt to assail defendant's credibility, the State highlighted the incident from October 2015 and asserted that he testified that Natalia scratched the word "p***" on his car. Yet, according to the State, the photographs, which it highlighted the defense never tendered, did not show the word "p***." The State remarked that "there's no photo that establishes the lies testified to under oath in this

courtroom by the defendant." The State further asserted: "The moment the defendant, who knew he had taken photographs of his scratched up car, attempted to commit deception upon this Court by lying and saying that those photographs established that the victim carved [the word] man whore [in Spanish] into his car is the moment when this Court should have realized that anything that comes out of the defendant's mouth cannot be considered credible or relied upon." The State concluded that it had proven defendant guilty of both home invasion and aggravated domestic battery beyond a reasonable doubt.

¶ 24                              E. Verdict and Sentencing

¶ 25    After the parties' closing arguments, the trial court found defendant not guilty of home invasion, but guilty of aggravated domestic battery when he strangled Natalia. The court further observed that the defense never submitted any credible, persuasive evidence that defendant was acting in self-defense, but it did not expressly discuss any of the evidence from trial.

¶ 26    Defendant subsequently moved for a new trial, arguing, in part, that the trial court erred when it ordered the defense to produce the four photographs of his car and then further erred when it considered those photographs in finding him guilty of aggravated domestic battery. The trial court, however, denied the motion without explanation, and it subsequently sentenced defendant to three years' imprisonment.

¶ 27    This appeal followed.

¶ 28                              II. ANALYSIS

¶ 29                         A. Sufficiency of the Evidence

¶ 30    Defendant first contends that the State failed to prove his guilt beyond a reasonable doubt where the evidence was closely balanced and showed he acted in self-defense.

¶ 31    When a defendant challenges the sufficiency of the evidence, the reviewing court must determine if, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the elements of the offense proven beyond a reasonable doubt. *People v. Gray*, 2017 IL 120958, ¶ 35. All reasonable inferences from the evidence must be made in the State's favor. *People v. Hardman*, 2017 IL 121453, ¶ 37. Under this standard of review, it is not the reviewing court's role to retry the defendant. *Gray*, 2017 IL 120958, ¶ 35. And the reviewing court will not substitute its judgment for that of the trier of fact on issues involving the credibility of witnesses, the weight to be afforded to the trial evidence, the drawing of reasonable inferences from the evidence and the resolution of conflicts within the evidence. *Id.* We may only reverse a conviction if "the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *Id.*

¶ 32    To prove defendant guilty of aggravated domestic battery as charged, the State had to prove he committed a domestic battery and while doing so, he strangled Natalia. 720 ILCS 5/12-3.3(a-5) (West 2014). Domestic battery occurs when someone knowingly and without legal justification causes bodily harm to a family or household member. *Id.* § 12-3.2(a)(1). A family or household member includes people "who have or have had a dating *** relationship." 725 ILCS 5/112A-3(b)(3) (West 2014). Although what constitutes bodily harm may be imprecise, for purposes of the battery statute, bodily harm means "some sort of physical pain or damage to the body, like lacerations, bruises or abrasions, whether temporary or permanent." *People v. Mays*, 91 Ill. 2d 251, 256 (1982). And strangulation is defined as "intentionally impeding the normal breathing or circulation of the blood of an individual by applying pressure on the throat or neck of that individual or by blocking the nose or mouth of that individual." 720 ILCS 5/12-3.3(a-5) (West 2014).

¶ 33 As noted, defendant raised self-defense at trial, which is an affirmative defense. 720 ILCS 5/7-1(a) (West 2014); see also *Gray*, 2017 IL 120958, ¶ 50. Under Illinois law:

> "[A] person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony."

720 ILCS 5/7-1(a) (West 2014). As an affirmative defense, the defendant has the burden of raising self-defense unless the State's evidence raises the issue. *People v. Everette*, 141 Ill. 2d 147, 157 (1990). To raise self-defense, the defendant must present some evidence that: "(1) force [was] threatened against a person; (2) the person [was] not the aggressor; (3) the danger of harm was imminent; (4) the threatened force was unlawful; (5) he actually and subjectively believed a danger existed which required the use of the force applied; and (6) his beliefs were objectively reasonable." *People v. Jeffries*, 164 Ill. 2d 104, 127-28 (1995). Once the defendant presents evidence of self-defense, the State must prove beyond a reasonable doubt that he did not act in self-defense, which it can do by negating any one of the elements of self-defense. *Id*. Whether the defendant needed to use self-defense is a question of fact to be resolved by the trier of fact (*Gray*, 2017 IL 120958, ¶ 51), who is "not obligated to accept a defendant's claim of self-defense" but rather must consider the claim based upon the circumstances. *People v. Rodriguez*, 336 Ill. App. 3d 1, 15 (2002).

¶ 34    In this case, it is clear that, if Natalia's version of events were believed, her testimony would have proven defendant's guilt for aggravated domestic battery beyond a reasonable doubt. First, her testimony demonstrated that she and defendant had been in a two-year relationship, thus satisfying the definition of a family or household member. See 725 ILCS 5/112A-3(b)(3) (West 2014). Natalia's testimony further showed that she broke up with defendant, but he appeared at her house later in the day. After Natalia told him to leave, he refused and became violent toward her. Defendant pulled Natalia, covered her mouth with his hands, threw her onto her bed and hit her in the shoulder. He then began choking her by placing both of his hands on her neck and squeezing to the point that Natalia was gasping for air and thought she was going to die. After being attacked by defendant, Natalia testified that she was left bruised and scratched on various parts of her body. This testimony undoubtedly demonstrated that defendant caused bodily harm to Natalia (see *Mays*, 91 Ill. 2d at 256) and strangled her, as defined by the aggravated battery statute. 720 ILCS 5/12-3.3(a-5) (West 2014). Additionally, as the evidence related to defendant's claim of self-defense, Natalia's testimony demonstrated that force was never threatened against him and, rather, at all times, he was the aggressor, thereby negating multiple elements of self-defense. See *Jeffries*, 164 Ill. 2d at 127-28. Therefore, the State established all of the elements necessary to convict defendant of aggravated domestic battery.

¶ 35    However, we reiterate that the State established all of the elements of aggravated domestic battery if Natalia's testimony were believed. Obviously, in defendant's testimony, he testified that Natalia had been the instigator of the altercation and he acted only to defend himself from her attacks. But it is well settled that the resolution of witness credibility is reserved for the trier of fact (*Gray*, 2017 IL 120958, ¶ 35) and reviewing courts generally do not second guess these determinations. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). The trial court implicitly

found Natalia's testimony on how the fight started and ended credible and truthful when finding defendant guilty of aggravated domestic battery. Yet, "[w]e also do not 'rubber stamp' credibility determinations, and when identifiable factors undermining those determinations exist, it is appropriate to conclude that a court or jury acted unreasonably in accepting a witness's testimony." *People v. Macklin*, 2019 IL App (1st) 161165, ¶ 19.

¶ 36    Although much of the case rested on a credibility contest between Natalia and defendant, the only two people in the basement when the fight began, key parts of Natalia's version had corroboration. For one, Maria came downstairs and observed defendant choking Natalia on the bed. While the parties did stipulate that Natalia never told Detective Soto that Maria was downstairs while defendant was on top of her, we must view the evidence in the light most favorable to the State. Additionally, Maria was prompted to go downstairs because Orduna's daughters heard "noises and screams" coming from the basement, further buttressing Natalia's version that she was screaming for help because defendant had attacked her. Moreover, the State introduced several photographs of Natalia taken by the police at the Cicero Police Department, which, according to her testimony, showed bruises, scratches and red marks on various parts of her body. Although these photographs were introduced at trial and entered as evidence, they were not included in the record on appeal, meaning we must resolve the incompleteness of the record against defendant. See *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984). Given the corroboration of key aspects of Natalia's testimony, nothing in the record would justify us overruling the trial court's credibility determination in her favor. Consequently, the State sufficiently proved defendant guilty of aggravated domestic battery beyond a reasonable doubt.

¶ 37                    B. Trial Court's Consideration of the Photographs

¶ 38    Defendant next contends that the trial court erred when it considered the four photographs of his car that were never offered into evidence, lacked a proper foundation and where the court mischaracterized what was depicted in the photographs. Based on the court's alleged consideration of improper evidence, defendant argues he was deprived of due process of law and is entitled to a new trial.

¶ 39    As discussed, during defendant's cross-examination, he testified that he took photographs of his vehicle after Natalia had scratched it and provided those photographs to his attorneys. The State believed it was entitled to these photographs under Illinois Supreme Court Rule 413 (eff. July 1, 1982) and asked for portions of defendant's testimony to be stricken as a result of the alleged discovery violation. During the discussion of the photographs, the trial court asked defense counsel if he had an objection to the court viewing the photographs, which counsel did not. The court proceeded to view the photographs and noted what it observed, specifically scratches on the car but no lettering. Later during the parties' argument over the alleged discovery violation, the court asked: "How should the Court view the fact that I actually have seen the four photos?" Defense counsel responded that it only gave the photographs to the court because the court asked for them. The court then remarked: "Right. And at this point I have seen the photos. And, based on my review, none of them appear to say what the defendant said they said, which is p***." The court then continued to hear further argument from the parties.

¶ 40    In a bench trial, there are multiple presumptions that we must make in regard to the trial court given its experience and knowledge. One such presumption is that the trial court knows the law and applies it in the correct manner. *People v. Howery*, 178 Ill. 2d 1, 32 (1997). Another presumption is that the court considers only admissible evidence and disregards inadmissible evidence when reaching a verdict. *People v. Naylor*, 229 Ill. 2d 584, 603 (2008). This is, in part,

because the court is eminently "capable of compartmentalizing its consideration of evidence." *People v. Schmitt*, 131 Ill. 2d 128, 137 (1989). Although we give the court these presumptions, they can be rebutted but only where the record affirmatively shows the court did not know the law, misapplied the law, or considered inadmissible or improper evidence. *Naylor*, 229 Ill. 2d at 603-04; *Howery*, 178 Ill. 2d at 32.

¶ 41   In this case, we initially note that the trial court only reviewed the four photographs in order to help resolve the State's request to strike portions of defendant's testimony, which was proper based upon the circumstances of the State's request and the need for the court to decide whether such a remedy was warranted. With that being said, although the photographs were never admitted into evidence at trial and showed that defendant may have lied under oath, the record does not affirmatively demonstrate that the court relied on the photographs in finding defendant guilty of aggravated domestic battery. Defendant highlights multiple instances of the court discussing the photographs, but all of these discussions occurred within the context of its resolution of the State's request to strike portions of defendant's testimony. In particular, in one instance, the court seemingly recognized that its review of the photographs could become an issue later when it asked: "How should the Court view the fact that I actually have seen the four photos" and then noted the apparent discrepancy between the photographs and defendant's testimony. This insight by the court that its review of the photographs could pose a future problem buttresses the presumption that it was capable of compartmentalizing its consideration of proper evidence and improper evidence (see *Schmitt*, 131 Ill. 2d at 137) and actually did so.

¶ 42   Although defendant argues in various places that the court "clearly considered" the photographs and there is "no question" that the court considered them, he cannot point to one statement from the court in the record showing it considered them and the potential effect they had

on his credibility when finding him guilty. Furthermore, as pointed out by defendant, the State referenced the photographs in its rebuttal closing argument and even went so far as arguing that he lied under oath based on the photographs contradicting his testimony. In light of this, the State argued that nothing defendant testified to could be deemed credible. Although the State made these arguments, an extension of the presumption that the trial court considers only admissible evidence is that the court only considers proper argument, and not argument based upon inadmissible evidence, when reaching its verdict. *People v. Burton*, 2012 IL App (2d) 110769, ¶ 15. As with the photographs, defendant cannot point to one statement from the court in the record showing that it considered this argument by the State when finding him guilty.

¶ 43    Given defendant's inability to point to affirmative evidence in the record, his argument relies on pure speculation, which is insufficient to overcome the presumption that the trial court considered only proper evidence. See *People v. Brumley*, 229 Ill. App. 3d 16, 20 (1992) ("Defendant's speculation that the trial court relied on evidence outside the record, without more, is insufficient to overcome a presumption that the trial court considered only proper evidence in reaching its decision."). Absent such evidence, we must presume the court understood the limited purpose for which it viewed the photographs and did not consider them or any argument of the State based on them when reaching its verdicts. See *Naylor*, 229 Ill. 2d at 603-04; *Howery*, 178 Ill. 2d at 32; *Burton*, 2012 IL App (2d) 110769, ¶ 15.

¶ 44    Additionally, defendant posits that the trial court actually mischaracterized what was depicted in the photographs and highlights that, in the fourth photograph, one can make out the letter "u" and possibly a "p" or an "o." While it may be the case that Natalie did actually write the word "p***," it is not clear from our review of the photograph and apparently neither of defendant's attorneys thought she had written the word "p***" based upon their exchange with

the trial court on the issue. Regardless, what is actually written is irrelevant because, as mentioned, the court properly reviewed the photographs because they were relevant to the State's request to strike parts of defendant's testimony and there is no affirmative evidence in the record showing the court considered the photographs and the potential effect they had on his credibility when finding him guilty. Still, for support, defendant relies on *People v. Miller*, 2013 IL App (1st) 110879, ¶¶ 1, 44, 52, 64-66, where this court reversed a defendant's conviction for aggravated possession of a stolen motor vehicle and remanded the matter for a new trial because the trial court mischaracterized evidence at trial and improperly excluded other evidence from trial. However, unlike in *Miller*, in this case, the trial court did not mischaracterize evidence at trial, as by defendant's own argument, the photographs were not evidence, and the court did not improperly exclude proper evidence. *Miller* is therefore inapposite. Consequently, the trial court did not commit error and defendant was not deprived of due process of law.

¶ 45                    C. Ineffective Assistance of Counsel

¶ 46    Lastly, defendant contends that his defense attorneys were ineffective where they failed to object to the State's rebuttal argument about the photographs, failed to move to strike the trial court's consideration of the photographs and failed to argue that the court mischaracterized the photographs.

¶ 47    To establish that trial counsel was ineffective, the defendant must satisfy the standard articulated in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Henderson*, 2013 IL 114040, ¶ 11. Under this standard, he must show that his counsel's performance was deficient and the deficiency prejudiced him. *People v. Valdez*, 2016 IL 119860, ¶ 14. More specifically, the "defendant must demonstrate that counsel's performance fell below an objective standard of reasonableness, and a reasonable probability exists that, but for counsel's unprofessional errors,

the result of the proceeding would have been different." *Henderson*, 2013 IL 114040, ¶ 11. Both prongs of the *Strickland* test must be met (*Valdez*, 2016 IL 119860, ¶ 14), and the defendant has the burden of persuasion. *People v. Peck*, 2017 IL App (4th) 160410, ¶ 26. Because the Strickland test contains two parts, we may review the prongs in any order (*People v. Lee*, 2016 IL App (1st) 152425, ¶ 56), and the failure to establish either precludes a finding of ineffective assistance of counsel. *Henderson*, 2013 IL 114040, ¶ 11.

¶ 48    In the instant case, as we have previously found that there was no affirmative evidence in the record that the trial court considered the photographs as evidence and the potential effect they had on defendant's credibility, even if defendant's attorneys' performance fell below an objective standard of reasonableness based on his allegations, defendant could not be prejudiced by evidence the court never considered. Consequently, because defendant cannot show prejudice from his attorneys' alleged ineffectiveness, his claim of ineffective assistance of counsel fails.

¶ 49                                    III. CONCLUSION

¶ 50    For the foregoing reasons, we affirm defendant's conviction.

¶ 51    Affirmed.